

**VIRGINIA:**

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF NEW YORK

In re:
VIRGINIA TRUE CORPORATION,   )
                             )
                             )
      **Debtor**    )
                             )
                             )  Chapter 11
                             )  Case No. CL19-42769
                             )

**AFFIDAVIT OF ROBERT C. SMITH**

I, ROBERT C. SMITH, having been duly sworn, hereby state as follows based on my personal knowledge:

1. I am over the age of 18 years old and a resident of Richmond, Virginia.
2. Among other disciplines and professional designations, I am a practicing lawyer. I became a member of the Virginia Bar in 1985.
3. In addition to practicing law, I have been engaged in venture capital, real estate development and sales, investment banking, finance and wealth management activities for most of my career.
4. I have owned companies that have developed residential subdivisions, built residential homes, owned shopping centers and office buildings and have gotten multi-use land development projects zoned as a principal and as a zoning lawyer.
5. I have taught history and economics at the University of Richmond. A copy of my curriculum vitae is attached as **Exhibit A**.
6. My family has lived in Tidewater, Virginia since shortly after Jamestown. I grew up in Richmond County, Virginia and have retained interests in a family business concentrated in the lumber and timber industries for all of my adult life. This business has long been the largest private employer in Richmond County.

1

7. In 2009, I was asked to be the zoning attorney for Rappahannock Cliffs, a 250 acre residential project in Richmond County on the Rappahannock River along "Fones Cliffs," a pristine area, nationally known for its beauty and environmental sensitivity.

8. After a 3 year zoning battle that grabbed national attention, the project was successfully zoned, permitted, bonded and was ready for development.

9. In 2014, my firm was engaged by Diatomite Corporation of America to rezone an approximate 1,000 acre parcel adjacent to Rappahannock Cliffs, also along Fones Cliffs, to 200 single family residential units.

10. Being very familiar with the area, the political environment, the economics of the County and the culture of the area, I recognized an opportunity to get the property zoned to a much higher use than I was contracted for, but also one that the citizens and local government leaders would embrace.

11. Richmond County is in an area known as the Northern Neck of Virginia, rural in character, but one of the most historically celebrated areas in the United States, known as the birthplace of numerous famous American families, colonial patriots, presidents and other pre-Revolutionary figures. The residents are very proud of their colonial lineage and architecture, but also very protective of their heritage and way of life.

12. The zoning that I proposed celebrated the history and culture of the area, with strict architectural controls, multiple historic monuments, parks and a robust continuing education program with concentrations in the arts and humanities, including, but not limited to history, creative writing workshops, the study of "great works" and other subjects meant to appeal to a demographic that has always appreciated the area's unique nature.

13. The concept was warmly received by local government officials. The zoning included a 169 room lodge, a conference center, a 150 seat restaurant, 718 residential units, an event center, 7 piers on the Rappahannock, an equestrian center, a golf course, and approximately 17 acres of retail/commercial uses.

14. I am not aware of any zoning project in Virginia, during my career that was as hotly contested or attracted such opposition and national scrutiny as this case did. Virtually every major newspaper in the country reported on the zoning case in either its print or electronic editions.

15. It is important for a zoning attorney to have core competencies in land use, engineering, construction, real estate development, finance and a broad panoply of related issues. The practical experiences I have had in development and construction have allowed me to be successful in large zoning cases as I understand these issues and can communicate effectively about them.

16. However, the absolute, most critical element of a zoning case is for the applicant and its primary proponent to have credibility, and to be scrupulously honest with government officials and concerned citizens.

17. In November of 2015, the project was successfully zoned, it was a major victory that included substantial wealth creation possibilities for the owner/developers.

18. Pursuant to the Richmond County Code, in order to vest the zoning rights obtained into perpetuity, the applicant needs to file a "Phase II" application which more specifically defines the layout of the use of the zoning rights approved with engineering and consulting feasibility studies confirming that the uses proposed meet various, local, state and federal regulations and guidelines.

19. Throughout the zoning process, my contact with Diatomite was mostly conducted through Howard Kleinhendler, a New York lawyer, who also represented Diatomite and its owner, Alan Applestein.

20. After the zoning was approved in November of 2015, Diatomite quit paying a number of its bills (including mine), and did not actively pursue Phase II zoning, which according to the Richmond County Zoning Ordinance, needed to be applied for within a year from Phase I approval (Nov. 2015).

21. I was able to get Richmond County to approve a one year extension.

22. During 2016, I was able to put together a team (hereafter "team") of architects, engineers and contractors interested in building a remote national membership golf club on the property, along the lines of Augusta National. This team consisted of some of the most celebrated names in the golf course industry, as there was wide acknowledgment among this group and their peers that the proposed golf club could be one of the most desirable and exclusive courses in the county, due to its physical attributes, rural nature and proximity to population centers. The team received very favorable press in golf course magazines and journals in the United States and Europe.

3

23. In December of 2016, I learned that Kleinhendler had reached an agreement with Diatomite to purchase the property in a stock deal. Stock deals to purchase development property are very rare, and in my experience are fraught with unfavorable legal and tax consequences. I cautioned Kleinhendler on this strategy and he assured me that his accountants had reviewed this strategy.

24. Kleinhendler asked me to prepare a memo on the property, the capital needed to get various zoning approvals, the timing of development phases and how the golf course financing and development could be structured.

25. In late 2016, Kleinhendler brought Ben Fernandez to Richmond to meet with me, tour the property, and meet with other members of the "team." They both expressed their desire for me to continue to represent the company, and made representations that they would pay all of the outstanding legal fees that Diatomite owed me, which at the time were approximately $137,000.

26. During this time Fernandez made representations about his ability to fund the project that I later discovered were not true. These false representations induced all members of the team to perform complimentary services and devote time and resources towards the project that they would not have been performed had Fernandez been truthful.

27. I later learned that Fernandez and Kleinhendler had induced Dom and Anthony Cipollone to invest $5,000,000 in the project.

28. In the month before Virginia True closed on the property, the deal structure suddenly changed from a stock purchase to an asset sale. For numerous reasons, the lack of foresight in structuring these acquisition terms troubled me and indicated a lack of business acumen and sophistication on the part of Kleinhendler and Fernandez, which later proved to be an accurate analysis. Both Kleinhendler and Fernandez assured me that they would make me "whole" at closing on my legal fees. I only got paid $100,000 and these were fees owed by Diatomite. After closing, they made many representations to pay my bills and urged me to continue working for them.

29. Just prior to closing I learned that Kleinhendler had become a director and officer of Diatomite, and he was also a director and officer of Virginia True. I recognized this as a conflict and suggested a dual representation letter would be appropriate, as Kleinhendler was performing legal services for both Diatomite and Virginia True. Kleinhendler ignored my advice.

30. I also learned, right before closing that the purchase arrangements that Kleinhendler struck with Diatomite did not include a deed of trust on the property.

31. Sometime after closing and after I had withdrawn from representing Virginia True due to Kleinhendler and Fernandez' dishonesty and misrepresentations, I began to wonder if Kleinhendler had taken advantage of Mr. Applestein for these reasons:

32. Just prior to Virginia True's closing on the property, I met Dom Cipollone and his son, who had come down to Richmond to view the property and discuss the development. Mr. Cipollone impressed me as a man of honor and integrity, and I was impressed with his "personal story." I had also by this time, had a number of conversations with the Cipollones' lawyer, Tom Mitchell, who I liked and felt very comfortable with.

33. Almost immediately after Virginia True closed on the property, a number of "red flags" appeared. The plan for the property, as I had proposed in numerous writings, and had been agreed to was to push through with the Phase II zoning, get permits and approvals to start developing a portion of the golf course, and to raise charter memberships from very wealthy individuals who wanted to be associated with the golf course. This required money. Fernandez promised to pay everyone, and that he had the capital to pay everyone.

34. After I withdrew from representing Virginia True, I learned that the company never had the money to meet its obligations and the representations it had made to Richmond County and team members, that it had bounced checks and that Fernandez had a $1 million judgment recorded against him in a fraud litigation case. I also learned that Fernandez had a very shady business background, peppered with fraud allegations and other dishonest conduct.

35. At closing, Fernandez signed a contract with Virginia True's golf course architect, Lester George. Mr. George performed a significant amount of free work, and Fernandez was in immediate default under the contract; he simply wouldn't pay him, while expecting him to do work. The excuses for non-payment were extraordinarily sophomoric.

36. Fernandez had me negotiate the purchase of additional properties, but kept changing the terms at the last moment to avoid having to outlay any money. He contracted for an approximate 300 acre adjacent property and defaulted on its closing. He contracted with a local contractor to clear a portion of the golf course, and refused to pay, and again

5

came up with truly ridiculous excuses as to why he hadn't paid them. This pattern persisted throughout the summer and late Fall of 2017, where he hadn't paid the land planner, the engineer, the lawyer (me), contractors, architects, surveyors, etc. He did not pay for a construction manager or local on-site manager for the project. He insisted on clearing a portion of the property, but he refused to pay an engineer to draw up plans to be submitted to the County for approval. In fact, no engineers familiar with the project would file plans and permits for Virginia True because they were all owed money. He even refused to pay for erosion control fencing, grass seed and straw to stabilize the land he had disturbed.

37. In late October and November, I was tasked with putting together an offering memorandum to raise over $15 million for the golf course club. Lester George and I had spoken to a number of very high net worth individuals interested in such memberships. During this process, a number of issues concerning Fernandez and Kleinhendler's, incompetency and dishonesty surfaced. These were, but were not limited to:

   a. failure to heed advice I had given them on holding the property in an LLC and the tax consequences associated with their decision.

   b. a complete lack of understanding of finance, budgeting and capital raising.

   c. no internal bookkeeping had been done.

   d. they had paid virtually no one

   e. they attempted to edit my offering memorandum to give them access to the capital raised for a different entity to pay themselves with no controls over their use of the money.

   f. it became apparent that they had lied and concealed much financial information from the Cipollones.

   g. they had lost all credibility with all of the team members and the community at large, including local government leaders, as word ( as if often the case in a small community) leaked out concerning their dishonesty, financial misrepresentations and l poor treatment of vendors trying to help them.

38. After the offering memorandum was drafted, it became apparent by all team members that Ben and Howard were "corrupt snake oil salesman" who didn't pay their bills and lied to their benefactors. Virtually all of the competent team members walked away from

their involvement with Kleinhendler and Fernandez, as people of integrity simply cannot be associated with dishonest people.

39. When it was obvious that no capital was going to be raised from potential charter members, Kleinhendler and Fernandez attempted to get Lester George to participate in a scheme to deceive the Cipollones by alleging money had been raised that had not.

40. As an attorney, I am duty bound to represent all shareholders, and once Kleinhendler and Fernandez' dishonesty was clearly evident, I contacted the Cipollones and their lawyer, Ian Kelley and wrote a series of letters to the entire board. I also paid some of Virginia True's outstanding bills, and paid an engineer to file erosion and sediment control plans, as Kleinhendler and Fernandez had even refused to pay the money to file permits after a stop work order was issued for their failure to file the proper permits.

41. During these discussions and communications, it was discovered that Kleinhendler and Fernandez had made blatant misrepresentations to the Cipollones about the status of the project; including but not limited to 1) concealing the fact that virtually none of Virginia True's vendors had been paid, 2) misrepresentations about capital raised, 3) deliberately lying to the Cipollones about wealthy Virginians, who they had never met or communicated with them, ready to invest millions of dollars, 4) concealing the fact that Virginia True had defaulted on purchase contracts to buy additional property owners, 5) failed to disclose that they had not filed any permits or filed any plans with Richmond County and that a stop work order had been issued, 6) failed to disclose that they had refused to remedy the stop work order, 7) reporting "fake" loans made to the company by themselves, 8) failed to disclose that they had spent virtually no money on engineering and consultant studies necessary to obtain Phase II zoning, and a host of other issues revealing their fraud and deceit.

42. After I had written the board disclosing the aforementioned facts, Fernandez called me and issued various threats, and actually wanted me to retract what I had written and state that I had had a "nervous breakdown." He mentioned that he would retaliate against me by not paying my outstanding and delinquent bills.

43. In my correspondence with the Board, I stated that I could not represent the company as long and Kleinhendler and Fernandez were stakeholders in the company, and I withdrew as counsel.

7

44. I found it astonishing that after being caught in so much deceit, Kleinhendler and Fernandez simply did not withdraw from the company and tender their stock to the Cipollones.

45. In my business community, if a principal is caught in deceitful or fraudulently activity, in all likelihood, his career is over. No one in the business community is likely to associate with them, and nothing could be more humiliating than to have been found to have engaged in fraud and deceit.

46. Also, in this business community, there is no "Scarlett Letter" worse for any individual or business than to not pay bills. In this case, it is especially damaging, as the business community views what Virginia True has done as "outsiders" taking advantage of local citizens. The project now has the black mark of being in bankruptcy; it will be all but impossible for the project to move forward, and it will lose all of its zoning and thus most of its value, unless new ownership and management is obtained. Kleinhendler and Fernandez have run the project in the ground.

47. In essence, Kleinhendler and Fernandez have defrauded a whole community. They have zero credibility, and Richmond County is not going to allow them to proceed with any Phase II zoning.

48. During the original zoning, Richmond County expended tremendous resources advancing the case, holding public hearings, doing their own studies, etc.

49. Richmond County is run by a 5 member Board of Supervisors, these supervisors expended a tremendous amount of time and their own personal resources understanding the zoning case and listening to constituencies. I felt as though I had credibility with all 5 members, and they, believing in the merits of the project "stuck their necks out" and approved it over overwhelming opposition.

50. The property was appraised for $18.5 million just prior to the November 2015 zoning. All Virginia True ever had to do was pay for approximately $1.3 to $1.8 million in expenses, and it could have gotten all Phase II zoning, would have completed actual engineering for roads and utilities for a section of the project and would have had a portion of the golf course underway in a manner to give charter members the confidence in the project to buy memberships. I believe the property's value would have easily increased at least another $10 million had they done this, all of which Kleinhendler and

Fernandez stated they would do when they induced all of the team members to work on the project.

51. I wrote numerous memorandums and spread sheets to Virginia True's management explaining in detail what needed to be done. $1.3 to $1.8 million is a very small amount of capital to spend to conform with Phase II zoning, record a subdivision plat and to develop part of the golf course.

52. The road map on how to make this project successful and create millions of dollars in additional value was handed to Kleinhendler and Fernandez on a silver platter. I have been in involved in many complex real estate transactions, and I have never seen such utter incompetence, dishonestly and mismanagement.

53. Kleinhendler and Fernandez caused Virginia True to incure hundreds of thousands of dollars of unnecessary liabilities by their inaction to remedy and refusal to spend the money to file erosion and sediment control plans at the time they started earth moving activities on the site. Even after the stop work order was issued, all they had to do was file the plans they should have filed originally and pay for less than $5,000 in erosion control measures (fencing, seed and straw). Instead, they did nothing and due to their ineptitude and flouting of state and local laws, they incurred hundreds of thousands of dollars in unnecessary expenses and fines, and infuriated state and local officials. It would have taken less than a week to comply with the stop work order, instead it took Virginia True nearly 6 months to do what could have occurred in 5 days. It was an astonishing display of hubris and incompetence.

54. Since Kleinhendler and Fernandez would not advance the money to pay for necessary Erosion and sediment control plans, my firm ordered the plans be drawn and advanced the money to pay for them.

55. I have also found it astonishing that after being caught in so many lies and misdeeds, Kleinhendler and Fernandez still think they can add value to this project. They seem to be totally immune to the damage they have caused the project, local citizens, the community and the County. They have no credibility and in my opinion have earned the reputation of being "dishonest charlatans" among County officials and the larger Richmond County community.

56. In my opinion, the project has been losing value everyday for over 18 months due to Kleinhendler and Fernandez association with it, and all the value created by the zoning is subject to being "wiped out."

57. Since I withdrew from the project in January of 2018, I knew with reasonable certainty, that if Kleinhendler and Fernandez did not withdraw from the project, the project would be doomed.

58. I have known all 5 members of the Board of Supervisors for decades. Based on statements made to me by Kleinhendler and Fernandez, I made representations to Board members and the public. After I learned the extent of Kleindhendler and Fernandez' deceit and misrepresentations to me, and after discussions with the Virginia Bar concerning my ethical responsibilities, I had a duty to speak to the supervisors about the project and misrepresentations that had been presented to them.

59. All of the Supervisors feel that the County has been the victim of a dishonest sham perpetuated by Kleinhendler and Fernandez. Everyone who supported the project has "egg on their face." The supervisors feel as though they have been "kicked in the teeth."

60. I recently spoke with the County Administrator. He told me that he is not going to approve anything that Virginia True proposes in that they can't be trusted and "he doesn't believe anything they say." For over a year, he has expressed these types of sentiments to me.

61. Every time there is an issue with Virginia True at the County, or Kleinhendler visits the County, I get calls, unsolicited from locals and County officials. They speak their minds to me and are extremely disdainful of Kleinhendler and anything he proposes or suggests.

62. These examples illustrate the dishonesty and incompetency of Kleinhendler and Fernandez:

    a. recently, it was brought to my attention that Virginia True submitted a forged document to Richmond County attempting to illustrate Waldorf Astoria's commitment to the project in the form of a "term sheet." The term sheet was written on a Waldorf Astoria letterhead. A Richmond County citizen was suspicious and contacted Waldorf, and was told that the term sheet was a forgery.

    b. After Virginia True filed its bankruptcy petition, Kleinhendler appeared at a Board of Supervisors meeting and spoke with a number of County officials. It is my

understanding that Kleinhendler made a number of representation and claims about the future success of the project, but did not mention to these officials that Virginia True had filed bankruptcy.

       c. Twice during the latter half of 2018, Kleinhendler represented that Virginia True had financing to pay off all its creditors. It is my understanding and belief that the financing fell through because Kleinhendler did not inform the lender that it had a $5 million obligation to the Cipollones and did not inform the lender that their funding would be used to retire this obligation.

       d. Kleinhendler has spent an inordinate amount of time trying to pitch a 30 story building to the County Administrator. Not only is this in total conflict with the Phase I zoning, it is utterly preposterous from a zoning, economic and engineering perspective. It will never happen and to propose such lunacy when Virginia True has hardly spent a nickel on Phase II zoning is foolhardy and destroys any semblance of credibility.

63.    I have received similar calls from state of Virginia officials expressing their dismay with Kleinhendler and Fernandez and their desire to see new ownership of Virginia True.

64.    The project cannot proceed without Phase II zoning. Other than building a golf course, no roads, no houses, no development that can lead to any kind of revenue can occur without this next step in the zoning process. This process requires hundreds of thousands of dollars and public hearings in front of and approvals by the Planning Commission and the Boar of Supervisors.

65.    After Phase II approval, the project needs to file a subdivision plat, which requires detailed engineering drawings and approvals from state and federal entities, and must be approved by the Board of Supervisors.

66.    Kleinhendler and Fernandez have had 26 months to begin the Phase II portion of the zoning, and have spent virtually no money on the necessary costs to advance this process. These costs include engineering studies, land planning analysis, soil studies, sewer and water studies and a host of other expenses and preliminary approvals from states and federal agencies.

67.    The project cannot advance without these approvals. In my opinion, Kleinhendler and Fernandez know next to nothing about the processes that need to occur and even if they had

the money to spend on these necessary expenses, they would not know how to advance the project.

68.     Moreover, I have been told by the County Administrator that he and the Board absolutely will not approve any further zoning as they can't believe anything that Kleinhendler tells them and that until there is new management and ownership, the County considers the project dead.

69.     In summary, the entire project, and all the value created is in jeopardy. As has been the case for the past 26 months, every day that goes by with Kleinhendler and Fernandez having any ownership or management responsibilities, is a day closer to total collapse of the underlying asset's value. The property has virtually no value without Phase II zoning, which will never be obtained without new management and a commitment of capital. Without these things, and the ability to develop the property, its value is simply in a cut over piece of timber land, which would be small fraction of the aforementioned $18.5 million appraisal.

Much of the information listed above is of public record in various Court filings in Richmond County, Virginia, in state agencies and of record with the Richmond County Administrator. I believe the information to be true and where I have offered my opinion on various matters, such opinion is grounded on my personal knowledge and experience with such individuals and my extensive experience in real estate development and zoning.

_____
Robert C. Smit

COMMONWEALTH OF VIRGINIA,
CITY OF RICHMOND:

SUBSCRIBED and SWORN TO by Robert C. Smith before me this 24th day of June, 2017.

My commission expires on ___7078731   May 31, 2023___.

[Lora D. Saunders notary seal: Commonwealth of Virginia, Notary Public, Commission No. 7078731, My Commission Expires 5/31/2023]

_____
Lora D. Saunders
Notary Public

[SEAL]

___7078731___
Notary Registration Number

# Curriculum Vitae

# ROBERT COLEMAN SMITH



**SUMMARY**

Robert Coleman Smith (Rob) is a Richmond lawyer with a very entrepreneurial business background focusing on real estate, finance, investment banking and wealth management services. His 33 year career began in 1986 when he became in house counsel for Virginia Landmark Corporation and project manager for several real estate development projects in central Virginia. By 1990, he had started his own company and was a principal in several large multi-use development projects where he had assembled the land, gotten the projects zoned, procured the development financing, managed the development and managed sales and marketing for each project. He has owned shopping centers, specialty retail properties, office buildings and has ben a principal in the construction of over 120 single family residential units. He has procured and paid back over $ 60 million of financing for development projects where he was a principal.

He has invested in and owned a number of diverse operating concerns; including wholesale distribution facilities, a chain of restaurants, convenience and gas stations; manufacturing, construction, technology and retail oriented businesses. He has provided investment banking services for a diverse national and international clientele.

As a lawyer, he focuses on real estate development, zoning and finance issues, but manages legal work for clients in an array of other disciplines. He owns Chartwell Capital Advisors, a full service legal, accounting and financial services firm which caters to the myriad needs of wealthy individuals and business owners. He is an outspoken proponent of property rights and is often asked by media and academic outlets to opine on zoning and property rights issues. Rob's firm Robert C. Smith, PLC co-counsels legal work with other lawyers and firms, allowing Rob to use his business expertise to manage legal work and to share his "real world" experiences with clients.

Rob is a native of the Northern Neck of Virginia. Rob enjoys teaching classes at the University of Richmond in history and economics. He is a father of three children, Ella (30), Coleman (29), and Sally (24). He has coached over 50 youth sports teams and is involved in numerous Richmond area civic organizations and charities. He is an avid reader and an enthusiastic supporter of the University of Virginia athletics. He is an active member of St. James Episcopal Church where he has served on the vestry, taught youth group and confirmation classes for many years.

**WORK EXPERIENCE**

    **Robert C. Smith, P.L.C.**
    **2008-2019**

Heavy emphasis on real estate development, zoning and real estate finance issues. Tax, finance and corporate legal analysis for wealthy clients and their business holdings. Won complicated financial fraud related cases at Virginia Supreme Court and Fourth Circuit Court of Appeals. Firm has strategic relationship agreements with several other law firms allowing Rob to manage a wide breadth of legal work.

**Chartwell Capital Advisors; Owner and Managing Partner**
**2008-2019**

Provide legal and financial services to businesses and wealthy individuals centered on estate and business succession planning, tax avoidance, financial planning and wealth protection. Firm either provides or broker/manages: legal, accounting, wealth management, banking and real estate advisory services through a "best in the industry" model that allows clients to receive outstanding professional services at competitive and fair prices.

**Chartwell Capital; Managing Partner**
**1999-2008**

Performed corporate finance advisory, capital structure services and strategic planning for companies that included:

- a $100 million in sales cigarette manufacturer w/ overseas production facility
- a hedge fund start up utilizing QQQ options
- a hydro-electric plant
- an international military parts distributor
- US owned rubber glove manufacturer operating in Mexican maquiladora
- Quebec granite company with mining operations in Virginia
- a military jet fighter training company
- Australian online soft furnishings retailer
- a national desktop computing utility
- a family owned newspaper publisher
- a retail chain of hair salons
- a company providing patient education services to hospitals
- a large multi-operational lumber and wood products plant
- an electronic gaming components developer/manufacturer
- Large retail and office developers

Duties performed for these and other companies were wide ranging and included: capital and legal structure analysis, debt and equity procurement, strategic business planning, financial statement analysis and review, sales and revenue enhancement, acquisitions, mergers and strategic partnership placement, outsourcing of labor and materials, growth strategies which emphasized using strategic sales partnerships as a means to attract capital without giving up ownership, as well as capital for equity ownership methods. Corporate finance services also included "cost cutting" operations evaluation, eliminating unnecessary expenses and improving production. Introduction of third party professional services to enhance quality and operations efficiency while reducing costs. Utilization of tax planning and estate strategies. Matching human resource talent with company needs. Cost segregation accounting for large commercial property owners.

**Piedmont Construction Services; Owner**
**2002-2008**

Company built single family houses in a golf course community in New Kent County, Virginia on a spec and custom basis. Built custom houses on infill sites in the City of Richmond. Built spec houses for 90 lot subdivision in Farmville, Virginia.

**Venture Capital**
**1992-2000**

During this period, focus changed from primarily real estate activities to purchasing operating companies (and their assets) to manage, grow and eventually sell.

- Bought Virginia franchise rights for Bojangles' Famous Chicken and Biscuits
- Grew 6 store chain to 17 locations with over 350 employees
- Sales grew from $2.4 million in sales to over $14 million
- Owned real estate and equipment in separate "property" company
- Built, owned and operated 2 full service gas station/convenience store/restaurants
- Orchestrated and negotiated sale of restaurants to Fortune 1000 company
- Bought electrical supply wholesale business out of US Bankruptcy Court
- Bought real estate assets of electrical supply company in Richmond and Chesapeake
- Started and grew wholesale "value added" specialty food business selling product to national grocery store chains and the military commissary system
- Acquired and operated in various ownership entities a number of real estate holdings including a suburban shopping center, a number of single purpose retail properties, suburban office buildings and residential investment properties.
- Promoted and invested in several other small companies

Arranged, procured and negotiated in excess of $50 million financing for all these activities. Experiences included: business planning, budgeting and sales strategies. Hiring operations director and managers and structuring performance based compensation agreements. Negotiating franchise agreements and wholesale procurement contracts from vendors. Acquisition of land and construction of single purpose retail centers. Negotiation of gasoline and diesel jobber agreements. Managed, developed and oversaw $50,000/month advertising budgets. Upgraded IT systems and implemented point of sales cash management systems. Managed all civil litigation including tort and EEOC claims, managed all outside legal counsel and performed in house legal duties. Bought investment property, negotiated leases and managed properties.

**Real Estate Development, Sales and Leasing**
**1986-1990**

- Commercial real estate agent, developer and lawyer with Virginia Landmark Corporation in Richmond, Virginia.
- Participated in brokerage sales and leasing of industrial, retail and office product.
- Brokered $12 million multi-use land parcel to national developer and orchestrated project through zoning.
- Developed single-family housing communities; implemented and oversaw marketing efforts.
- Arranged for acquisition and development financing; budgeting and forecasting for various development projects.

- In 1989, formed Commonwealth Land Trust and all activities centered on real estate development transactions and investments for which I was the principal investor, promoter and developer.
- These activities included: Construction of single-family housing. Contract, rezoning, purchase and development of townhouse for sale property. Assemblage, contracting, rezoning and purchasing of a number of land transactions and selling the rezoned portions to end users. Orchestrated and managed work with bankers, lawyers, engineers, government planners and politicians, contractors and other third parties.

**EDUCATION:**

**University of Virginia**, Charlottesville, Virginia
Bachelor of Arts, 1981: History Major and Minor in Government

**University of Richmond Law School,** Richmond, Virginia
Juris Doctor, 1985

**Emmanuel College, Cambridge University**, Cambridge England
Studied international law, English legal history and comparative government, 1982

**SKILLS AND STRENGTHS:**

Excellent communication, sales and people skills
Strong understanding of finance and economics
Big picture grasp of complex business issues
Superior knowledge of legal issues
Creative, visionary and energetic

**CERTIFICATIONS:**

Admitted to Virginia Bar and Federal Court system
Admitted to United States Bankruptcy Court
Virginia Class A construction license (inactive since 2009)
Virginia License in real estate sales
FINRA licensed in securities (inactive since 2012)
Virginia license to sell life insurance and annuities
Virginia license to sell property and casualty insurance
Virginia license to sell health insurance
Wealth Counsel Member
Certified Commercial Investment Member courses

*