UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:                                                              Chapter 11
VIRGINIA TRUE CORPORATION,                        Case No. 19-42769 (NHL)

                               Debtor.
--------------------------------------------------------x

## DISCLOSURE STATEMENT IN CONNECTION WITH
## CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL *BUT HAS NOT YET BEEN APPROVED BY THE COURT.***

**PICK & ZABICKI LLP**
369 Lexington Avenue, 12th Floor
New York, New York 10017
(212) 695-6000
Douglas J. Pick, Esq.
Eric C. Zabicki, Esq.

*Counsel to the Debtor*

## I.    PURPOSE OF THIS DISCLOSURE STATEMENT

Virginia True Corporation, the debtor and debtor-in-possession herein (the "Debtor"), provides this Disclosure Statement (the "Disclosure Statement"), pursuant to §1125(b) of title 11 of the United States Code (the "Bankruptcy Code"), to all of its creditors and other parties-in-interest for the purpose of soliciting acceptances of the Chapter 11 Plan of Reorganization (the "Plan") proposed by the Debtor.  The Plan has been filed with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") and a copy of the same is attached hereto as *Exhibit "A"*.  By Order dated _____, 2020, this Disclosure Statement was approved by the Bankruptcy Court as containing "adequate information" of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the Debtor's creditors to make an informed decision whether or not to object to Confirmation of the Plan.

**Capitalized terms utilized, but not defined herein, have the meanings ascribed to them in the Plan.  The Debtor strongly urges that you read this Disclosure Statement because it contains a summary of the Plan provisions and important information concerning the Debtor's financial affairs, the administration of the Debtor's bankruptcy estate and the anticipated recovery by creditors of the Debtor.**

Briefly, and as more fully discussed at length herein, the Plan provides for a reorganization of the Debtor's financial obligations and affairs.  Under the Plan, all Statutory Fees, Administrative Claims, Secured Claims, Priority Tax Claims and General Unsecured Claims will be fully paid, with interest, if any (*i.e.*, a 100% recovery by all creditors).  The existing Interests (*i.e.*, equity) in the Debtor will be cancelled.   The Plan will be implemented through, and the Distributions contemplated to be made under the Plan will be funded by, the

Exit Package which consists of $5,500,000 in new capital contributions to the Debtor and $3,000,000 in senior secured "exit" financing.  On the Effective Date of the Plan, the Debtor will be recapitalized such that the Interests in the Reorganized Debtor shall be reallocated pursuant to the terms of a mutually agreeable Operating Agreement.

The Effective Date shall be the later of: (a) one (1) Business Day after the Confirmation Order becomes a Final Order; or (b) the date all conditions to the Effective Date have been satisfied or waived.  The conditions to the Effective Date include the Exit Package Approval Order (*i.e.*, the Order authorizing the Debtor to obtain the Exit Package) having become Final Order and all actions required to be taken to implement the Confirmation Order (including the deposit of the proceeds of the Exit Package needed to fund the Distributions provided for under the Plan with the Disbursing Agent) having occurred.

Since no Claims or Interests are impaired under the Plan, the holders of said Claims and Interests are deemed to have accepted the Plan.  **Accordingly, the Debtor is not soliciting ballots on the acceptance or rejection of the Plan from any Class of Claims or Interests.  Holders of such Claims or Interests are still entitled to object to Confirmation of the Plan.**

## II.    DISCLAIMER

NO PERSON MAY BE GIVEN ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THAT DATE.  ALL CREDITORS SHOULD READ CAREFULLY AND CONSIDER FULLY THIS DISCLOSURE STATEMENT BEFORE VOTING FOR OR AGAINST THE PLAN.  TO THE EXTENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.  TERMS USED IN THIS DISCLOSURE

STATEMENT BUT THAT ARE NOT OTHERWISE DEFINED HEREIN HAVE THE MEANING ASCRIBED TO THEM IN THE PLAN AND, IF NOT DEFINED IN THE PLAN, THEN IN THE BANKRUPTCY CODE.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS THE EQUIVALENT OF A STATEMENT MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE DEBTOR'S CHAPTER 11 CASE, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED FROM THE DEBTOR'S BOOKS AND RECORDS AND PUBLIC PLEADINGS. ALTHOUGH DILIGENT EFFORTS HAVE BEEN MADE TO PRESENT ACCURATE AND COMPLETE INFORMATION, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION IS WITHOUT SOME INACCURACY OR OMISSION.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR. ANY VALUE GIVEN AS TO ASSETS OF THE DEBTOR IS BASED UPON AN ESTIMATION OF SUCH VALUE. YOU ARE URGED TO CONSULT YOUR OWN COUNSEL AND FINANCIAL AND TAX ADVISORS IF YOU HAVE ANY QUESTIONS OR CONCERNS REGARDING TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS.

THE DISCLOSURE STATEMENT ORDER, A COPY OF WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, SPECIFIES THE DEADLINES, PROCEDURES, AND INSTRUCTIONS FOR VOTING TO ACCEPT OR REJECT THE PLAN AND FOR FILING OBJECTIONS TO CONFIRMATION OF THE PLAN. A FORM BALLOT FOR VOTING ON THE ACCEPTANCE OR REJECTION OF THE PLAN IS ALSO PROVIDED HEREWITH. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD READ THE

DISCLOSURE STATEMENT, THE PLAN AND THE DISCLOSURE STATEMENT ORDER
IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

### III.    BACKGROUND CONCERNING THE DEBTOR, THE BANKRUPTCY FILING AND THE ADMINISTRATION OF THE DEBTOR'S ESTATE

### A.    Background Concerning the Debtor and its Bankruptcy Filing

#### 1.    The Debtor's Organizational Structure

The Debtor is a Virginia corporation formed on March 30, 2017 for the purpose of acquiring and developing an approximately 977-acre parcel of land located in Richmond County, Virginia (the "Property").   At the time of its incorporation, the sole shareholders of the Debtor were Benito R. Fernandez ("Fernandez") holding 34%, Howard Kleinhendler ("Kleinhendler") holding 34%, and Anthony Cipollone and plaintiff Domenick Cipollone (together, the "Cipollones") jointly holding 32% of the Debtor's stock.   In consideration of the shares of Virginia True's stock collectively issued to them, the Cipollones made a capital contribution to Virginia True in the sum of $5,000,000.

#### 2.    Acquisition and Development of the Property

Pursuant to a deed dated April 27, 2017, Virginia True acquired title to the Property from Diatomite Corporation of America ("Diatomite").  In consideration thereof, the Debtor executed and delivered an unsecured promissory note, dated April 27, 2017, in the principal amount of $7,000,000 to Diatomite (the "Diatomite Note").

Prior to the Debtor's acquisition of the Property, and in 2015, the Property was granted "Phase I" rezoning so as to permit the construction of 718 residential homes/units, a 160-room hotel, an 18-hole golf course and 30,000 square feet of retail space (the "Development Project"). Upon its acquisition of title to the Property, the Debtor continued with rezoning by submitting a "Phase II" zoning application and obtaining a necessary wetlands delineation approved by the

5

U.S. Army Corps of Engineers and other relevant studies.  The Property is located within a designated "Opportunity Zone" which was created pursuant to the changes made to the federal tax laws in 2017 to offer tax incentives for long term investments in areas deemed to have high poverty rates and sluggish job and business growth.

3. Alleged Environmental Violations and Stalled Development Efforts

In 2018, an action was commenced in the Circuit Court of Richmond County (Virginia) (the "Circuit Court") entitled *David K. Paylor, Director of the Department of Environmental Quality and the State Water Control Board v. Virginia True Corporation*, Case No. CL18-122 (the "Environmental Enforcement Action").  By way of the Environmental Enforcement Action, the plaintiffs therein asserted that the Debtor had violated the State Water Control Law, the Virginia Stormwater Management Program Regulations, the Erosion and Sediment Control Regulations, and the General Virginia Pollutant Discharge Elimination System Permit for Discharges of Stormwater from Construction Activities.  The alleged violations stemmed largely from the Debtor having cleared, but allegedly having failed to adequately stabilize, thirteen (13) acres of the Property.[1]  The Development Project was also opposed by environmentalists and others which brought the Debtor's efforts to proceed with the Development Project to a standstill.

4. Disputes With the Cipollones

On or about September 27, 2018, the Cipollones served a written notice advising of their election to compel the Debtor to purchase their stock in the Debtor for the sum of $5,000,000 pursuant to a "buy-out" clause contained in a certain Stockholders' Agreement.  The Debtor did

---

[1] The DEQ had also alleged violations by the Debtor under Notices of Violation dated February 15, 2018, April 4, 2018, and August 3, 2018, and under the DEQ's Virginia Water Protection Inspection Report dated November 7, 2018 (collectively with the violations alleged against the Debtor in the Complaint, the "Environmental Claims").

not have the funds to purchase the Cipollones' shares.  In furtherance of their efforts to force the Debtor to purchase their shares of stock or to give them a first lien on the Property, the Cipollones expressly threatened to oppose any effort by the Debtor to borrow any money to fund the development of the Property or to pay its day-to-day expenses and commenced litigation against the Debtor to enforce the stock "buy-out" clause.  Ultimately, on or about December 11, 2018, the Debtor executed and delivered a $5,000,000 promissory note to the Cipollones maturing on April 27, 2019 (the "Note") and secured by a Deed of Trust with regard to the Debtor's interests in the Property (the "Deed of Trust").  On or about December 11, 2018, the Cipollones also surrendered their respective shares of the Debtor's stock to the Virginia True (leaving Fernandez and Kleinhendler with equal, 50/50, equity positions in the Debtor). However, the Debtor was not able to satisfy the Note upon its maturity.

5.  The Debtor's Bankruptcy Filing

With the Development Project stalled and facing the imminent prospect of efforts by the Cipollones to enforce their Deed of Trust against the Debtor's interests in the Property, the Debtor consulted with counsel to discuss the commencement of a chapter 11 bankruptcy proceeding.  The Debtor determined that, if afforded the benefits of the automatic bankruptcy stay so as to maintain the status quo, it could successfully reorganize its financial affairs and continue its efforts to complete the Development Project for the benefit of all of its creditors. Accordingly, on May 3, 2019 (the "Petition Date"), the Debtor sought relief under chapter 11 of the Bankruptcy Code.

**B.  Administration of the Debtor's Estate**

1.  General Bankruptcy Information

Subsequent to the Petition Date, the Debtor continued to manage its property and affairs

7

as a debtor-in-possession pursuant to §§1107 and 1108 of the Bankruptcy Code.  The Debtor's Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs, were all filed with the Bankruptcy Court pursuant to Bankruptcy Rule 1007(b) (together, and as amended from time to time, the "Schedules").  No committee, trustee or examiner has been appointed with regard to the Debtor's case.

2.  <u>Retention of Professionals</u>

Upon its chapter 11 filing, the Debtor immediately began efforts to efficiently and expeditiously administer its bankruptcy estate.  In furtherance thereof, the Debtor sought and was granted authority to retain: (a) the law firm Pick & Zabicki LLP as its general bankruptcy counsel with regard to its chapter 11 case; (b) Reed Smith LLP as its special counsel with regard to the Environmental Enforcement Action and other Virginia legal issues/matters; and (c) Rubino & Company as its accountants.

3.  <u>Claim Solicitation and Review</u>

The Debtor and its Professionals sought to solicit the filing of proofs of claim by potential creditors of the Debtor and to reconcile any proofs of claim asserted.  In furtherance thereof, and upon the application of the Debtor, an Order was entered on June 22, 2019 establishing August 7, 2019 as the last date for non-governmental units, and October 30, 2019 with regard to governmental units, to file proofs of claim on account of pre-Petition Date obligations of the Debtor.  A Bankruptcy Court-approved Notice to File Claims was mailed to all known or potential creditors and parties in interest in connection with these claim filing "bar dates".  A total of thirteen (13) proofs of claim were filed by potential creditors of the Debtor.

The Debtor and its Professionals undertook an analysis of each proof of claim filed by alleged creditors of the Debtor in an effort to reconcile same.  The Debtor filed formal objections

to certain of the filed proofs of claim. However, the Debtor reserves the right to object to any proof of claim or other request for payment either prior or subsequent to Confirmation of the Plan in accordance with the claim objection provisions of the Plan.

   4.   Post-Petition Litigation With the Cipollones

On September 4, 2019, the Debtor commenced an adversary proceeding against the Cipollones in the Bankruptcy Court to: (a) avoid any lien alleged to have arose in favor of the Cipollones against the Debtor's interest in the Property as a fraudulent conveyance and/or a preferential transfer of an interest of the Debtor in property; or, alternatively (b) equitably subordinate any and all claims which the Cipollones may purport to have against the Debtor to all other valid claims against and interests in the Debtor and ordering that any lien securing such subordinated claims be transferred to the Debtor's estate. Diatomite was subsequently authorized to intervene in the adversary proceeding. On January 28, 2020 an amended complaint was filed with the Court seeking essentially the same relief as set forth above.

Also, on December 3, 2019, the Cipollones commenced an action in the Circuit Court for the County of Richmond (the "Circuit Court") entitled *Anthony Cipollone and Domenick Cipollone v. Allan Applestein, Diatomite Corporation of America, Howard Kleinhendler and Benito Fernandez*, Case No. CC19-149, seeking to recover "compensatory damages in an amount of at least $5 million, treble damages under Virginia Code § 18.2-500, prejudgment interest, the Cipollones' reasonable attorneys' fees and expenses, court costs and such other and further relief as is necessary and appropriate" from Allan Applestein (the principal of Diatomite), Diatomite, Kleinhendler and Fernandez in connection with their investment in the Debtor. The crux of the action is that the Cipollones were allegedly defrauded by the defendants into investing the $5,000,000 in the Debtor that they seek to recover (and on account of which they

filed a proof of claim in this case which is the subject of the above-discussed adversary proceeding) based on causes of action sounding in fraudulent inducement to contract, tortious interference with contract and civil conspiracy under Virginia common law and Virginia Code § 18.2-499,-500. Kleinhendler recently removed this action from the Circuit Court to the United States District Court for the Eastern District of Virginia (where it was assigned Case No. 20-03002-KRH), for subsequent transfer thereof to the Bankruptcy Court, and in the alternative to dismiss the complaint.[2]

5. Resolution of Environmental Claims

Immediately prior to the Petition Date, the Debtor had been in the process of negotiating a settlement of the Environmental Claims with the plaintiffs in the Environmental Enforcement Action (collectively, the "DEQ"). Those negotiations continued subsequent to the Petition Date and, ultimately, led to the resolution of the Environmental Claims upon more fully described in a proposed Consent Decree. A motion seeking Bankruptcy Court approval of the settlement has been filed with the Bankruptcy Court.

6. Post-Petition Financing

Upon its chapter 11 filing, and having no operating income, the Debtor was in immediate need of cash in order to run the day-to-day operations of its business and to make working capital expenditures in furtherance of its business purpose (such as paying engineers, surveyors, and the like in connection with the development of the Property). Fernandez agreed to lend the

---

[2] Additionally, on December 13, 2019, Allan Applestein and Diatomite commenced an action in the United States District Court for the Southern District of Florida entitled *Allan H. Applestein, an individual, and Diatomite Corporation of America a Maryland corporation v. Howard Kleinhendler, an individual, Wachtel Missry LLP, a limited liability partnership, and DOES 1 through 5*, Case No. 19-cv-25154, seeking to recover compensatory damages and restitution in excess of $7,000,000 (substantially all of which is encompassed in a proof of claim filed by Diatomite in this case), punitive damages, the imposition of a constructive trust over "all assets of Defendants" and costs of suit. A motion has been filed seeking to stay further proceedings in this action pending resolution of Diatomite's proof of claim filed in this case and in the alternative to dismiss the complaint.

Debtor up to the amount of $100,000 on an unsecured basis, with interest thereon at 9% per annum, and as an ordinary (*i.e.*, as opposed to a "superpriority") administrative expense of the Debtor's estate.  Said financing was approved on an interim basis and a total of six (6) separate Orders have been entered authorizing the Debtor to borrow and expend amounts totaling approximately $70,300.00 from Fernandez, but without interest.

7.  Efforts to Obtaining Additional Financing and/or Equity Investments

The Debtor believes that the Property has a current estimated fair market value of between $13,500,000 and $18,000,000.[3]  Since its acquisition of the Property, the Debtor has pursued multiple alternative capital sources, including equity and debt financing.

As a result of its extensive efforts, the Debtor has negotiated and is currently drafting written term sheets pursuant to which, among other things, and subject to the approval of Bankruptcy Court:

(a)    Fernandez has agreed to make a $1,000,000 capital contribution and a group led by Gary Chen, a successful real estate developer (the "Chen Group"), has agreed to make a $500,000 capital contribution to the Debtor (subject to loan documentation) on the Effective Date of the Plan;

(b)    JEC Capital Partners has agreed to extend the $3,000,000 in senior secured Exit Financing to the Debtor within fifteen (15) days after the entry of the Confirmation Order (the "Exit Financing");

(c)    The Chen Group has agreed to make an additional $2,000,000 capital contribution to the Debtor sixty (60) days after the entry of the Confirmation Order; and

---

[3] The Debtor is in the process of obtaining a comprehensive appraisal of the Property.

(d)      The Chen Group has agreed to make an additional $2,000,000 capital contribution to the Debtor one hundred (120) days after the entry of the Confirmation Order (collectively with the aforementioned capital contributions agreed to be made by the Chen Group and Fernandez, the "Exit Equity Contribution").

As will be further discussed in a separate motion for approval thereof, the Exit Financing loan will mature in one (1) year but can be extended for an additional one (1) year term and provides for interest of 12.5% in the first year and, if extended, 13.5% in the second year and requires a senior secured note and a senior secured mortgage on the Property.   Also, in consideration of the Exit Equity Contribution, the membership interests in the Reorganized Debtor will be allocated between Fernandez, Kleinhendler and the Chen Group pursuant to the terms of a mutually agreeable Operating Agreement.

8.  <u>Summary</u>

As a result of, among other things, the settlement with the DEQ and the Exit Package, the Debtors believe that they will be able to successfully emerge from chapter 11, complete the Development Project, and operate profitably going forward.[4]   The illustrations above are merely a sampling of the numerous steps taken during the administration of the Chapter 11 Case.   The Chapter 11 Case, as well as the Debtor's Estate, have been fully administered with an eye toward

---

[4] Simultaneously herewith, the Debtor is filing declarations executed by James Fakuda (a consultant specializing in the construction, financing and development of hospitality hotels, as well as the development of luxury condominiums, affordable assisted living and veterans housing), Michael Safko (a consultant and project manager with the firm MS Consultation Solutions LLC specializing in hospitality and condominium development), and Jeffrey L. Howeth, P.E., L.S., C.F.M. (a licensed Virginia professional engineer and land surveyor) detailing, among other things, the Debtor's plans with regard to moving forward with the Development Project.  Attached hereto as *Exhibit "B"* are copies of the Letter of Intent, along with a letter extending same, signed by the Dream Hotel Group regarding its assistance with the building of a Chatwal Hotel on the Property referenced in Mr. Safko's declaration. Attached hereto as *Exhibit "C"* is a pro forma analysis prepared by the Dream Hotel which was attached as an exhibit to the declaration of David Kuperberg, Chief Development Officer, previously filed in this case (ECF No. 111-4).  Attached hereto as *Exhibit "D"* is a pro forma analysis of the hotel construction costs prepared by Mr. Fukuda.  Attached hereto as *Exhibit "E"* is a comprehensive analysis of the future prospects, future income and future liabilities of the Debtor, including its obligations under the Plan, prepared by Rubino & Company (the "Projections").

maximizing the value of the Debtor's assets and operations for all creditors. Accordingly, the Debtor now proposes the Plan to their creditors and parties in interest.

## IV.    OVERVIEW OF THE PLAN

### A.    Generally

The overall purpose of the Plan is to distribute value to the Debtor's creditors on a fair and equitable basis and in accordance with the priorities established by law and/or by agreement. The Plan represents the culmination of the analyses conducted and efforts expended by the Debtor and its Professionals concerning the best means to maximize and allocate value to the Debtor's creditors. The Debtor has determined that the Plan provides the highest value to creditors and would permit the distribution of that value to its creditors more expeditiously and with less expense than might otherwise be achievable in a liquidation under chapter 7 of the Bankruptcy Code. Accordingly, the Debtor recommends that the Plan be accepted by its creditors.

### B.    Summary of Classification and Treatment of Claims

Under the Plan, Claims against the Debtor are grouped into Classes according to their similarity with other Claims and their relative legal and contractual priorities. Under the Bankruptcy Code, only the holders of Allowed Claims in "impaired" Classes are entitled to vote and to receive Distributions under the Plan. The classification and treatment of such Claims are summarized below. All Claims other than Statutory Fees, Administrative Claims, and Priority Tax Claims are placed in Classes under the Plan. The Debtor believes that this classification scheme is consistent with the requirements of the Bankruptcy Code.

#### 1.    Statutory Fees

The Debtor (and the Reorganized Debtor) has a statutory duty to pay all outstanding

amounts that may be due to the United States Trustee upon Confirmation, together with any fees due pursuant to 28 U.S.C. §1930(a)(6) through the date of the entry of a final decree closing the Chapter 11 Case, conversion of the case to chapter 7 or dismissal of the case. Any Statutory Fees that are due on or prior to the Effective Date of the Plan, including any applicable interest, shall be paid on the Effective Date. Statutory Fees that may become due after the Effective Date shall be paid as they become due by the Reorganized Debtor until the entry of a final decree closing the Chapter 11 Case, conversion of the case to chapter 7 or dismissal of the case.

### 2.    Administrative Claims

Administrative Claims are defined in the Plan as the costs and expenses of administration of the Debtor's chapter 11 case incurred on or after the Petition Date, and (except as to post-Petition Date obligations incurred and/or paid by the Debtor in the ordinary course) allowed by final order under §503(b) of the Bankruptcy Code. These claims include, without limitation, any actual and necessary expenses: (a) of preserving the Estate of the Debtor; (b) any costs and expenses of the Debtor and/or the Reorganized Debtor for the management, maintenance, preservation, sale or other disposition of any assets; (c) the administration and implementation of the Plan; (e) the administration, prosecution or defense of Claims by or Claims against the Debtor and for Distributions under the Plan; and (f) any allowances of professional compensation and reimbursement of expenses to the extent allowed by an order of the Bankruptcy Court, whether arising before or after the Effective Date.

The only known potential Administrative Expense Claims are amounts owed by the Debtor to: (a) Fernandez on account of the DIP Financing; and (b) its Professionals on account of professional services rendered and reimbursable expenses incurred during the course of the Chapter 11 Case. If there is no significant litigation initiated or objections filed with respect to

Confirmation of the Plan, and the Plan is confirmed within the next sixty (60) to ninety (90) days, the Allowed Administrative Claims are estimated to total approximately $450,000.00. The actual amounts of the Allowed Administrative Claims may increase or decrease from the foregoing estimated amounts prior to the Effective Date of the Plan and are subject to, among other things, the approval thereof by the Bankruptcy Court upon the submission of appropriate applications for allowances of compensation and reimbursement of expenses.

In accordance with certain mandatory provisions of the Bankruptcy Code, the Plan provides that holders of Allowed Administrative Claims will be entitled to full payment of their Claims: (a) in cash on the Effective Date; or (b) on such terms as are mutually agreed to by the holder of an Allowed Administrative Claim and the Debtor. Administrative Claims are unclassified under the Plan and holders of Allowed Administrative Claims are not entitled to vote on the acceptance or rejection of the Plan.

### 3.    Priority Tax Claims

Priority Tax Claims are unclassified under the Plan and include claims for tax-related obligations that are entitled to priority under §507(a)(8) of the Bankruptcy Code. Generally, Priority Tax Claims are (subject to certain timing and date of assessment limitations) unsecured claims of "governmental units" (as defined in the Bankruptcy Code) based upon: (a) taxes measured by income or gross receipts; (b) property taxes; (c) withholding taxes; (d) employment taxes; (e) excise taxes; (f) customs duties; and (g) penalties based on actual pecuniary losses relating to the foregoing. These Priority Tax Claims include, among others, all taxes measured by income or gross receipts attributable to the three-year period immediately preceding the Petition Date (*i.e.*, from May 3, 2016 through the Petition Date).

The only known potential Priority Tax Claims against the Debtor were asserted by: (a) the Internal Revenue Service (Claim No. 1) in the amount of $4,800; and (b) the New York State Dept. of Taxation and Finance (Claim No. 12) in the amount of $39.75.  The Debtor does not believe that any other potential Priority Tax Claims exist and the bar date established by this Court for the filing of such claims (*i.e.*, October 30, 2019) has passed.  In accordance with certain mandatory provisions of the Bankruptcy Code, the Plan provides that any Allowed Priority Tax Claims existing as of the Effective Date will be fully paid on the Effective Date or in equal and consecutive monthly installment payments in cash equal to the Allowed Amounts of such Claims, with interest thereon at the applicable rate, over a period ending not later than five (5) years after the Petition Date absent the consent of the holders of Allowed Priority Tax Claims.  Priority Tax Claims are unclassified under the Plan and holders of Allowed Priority Tax Claims are not entitled to vote on the acceptance or rejection of the Plan.

### 4.    Class 1 – Cipollone Secured Claim

Class 1 consists of the Secured Claim of the Cipollones against the Debtor (Claim Nos. 9 and 10, essentially duplicate claims)  each in the amount of $5,000,000 representing the unpaid amounts purportedly owed under the Cipollone Note and purportedly secured by the Deed of Trust against the Debtor's interests in the Property.  As discussed above, the Debtor has commenced an adversary proceeding against the Cipollones seeking to avoid any lien which they claim to have against the Property or, alternatively, to subordinate any claims which the Cipollones may assert to have against the Debtor or its estate to the claims of all other creditors. Accordingly, the Cipollones' Secured Claim in Class 1 is treated as a Disputed Claim under the Plan.

Pursuant to the Plan, the Allowed Amount, if any, of the Cipollone Secured Claim will be fully paid as follows: (i) if the Cipollone Secured Claim is reclassified as a General Unsecured Claim, then the Allowed Amount of such Claim will be treated the same as all other General Unsecured Claims in Class 3 are treated under the Plan or (ii) if the Cipollone Secured Claim is allowed as a Secured Claim, the Allowed Amount of Such Claim will be fully paid, with interest at the rate of 5% per annum, over five years (5) years pursuant to the issuance of a  new Promissory Note providing for interest payments and return of principal by the fifth (5th) year anniversary of the Effective Date.

Class 1 is not impaired under the Plan and, thus, the Cipollones are deemed to have accepted the Plan.

5.    **Class 2 – DEQ Claim**

Class 2 consists of the Allowed Claim of the DEQ (Claim No. 13) on account of monies owed by the Debtor under the Consent Decree.  Under the Plan, and consistent with the terms of the Consent Decree, in full satisfaction of the Allowed DEQ Claim in Class 1, the DEQ will be paid the full amount of its agreed-upon Claim in the amount of $200,000 accordance with the terms of the Consent Decree, the terms of which are incorporated in the Plan by reference.   The Debtor's compliance with these and its other obligations under the Consent Decree will continue to be secured by the terms and conditions of the Consent Decree.

Class 2 is not impaired under the Plan and, thus, the DEQ is deemed to have accepted the Plan.

6.    **Class 3 – General Unsecured Claims.**

Class 3 consists of Allowed General Unsecured Claims against the Debtor which consist of all Claims against the Debtor other than Statutory Fees, Administrative Claims, Priority Tax

Claims or Secured Claims. Under the Plan, and subject to the provisions of the Plan with respect to Disputed Claims, the Allowed Amounts of the Class 3 General Unsecured Claims will be fully paid, with interest at the rate of 4% per annum, as follows: (a) a pro rata Distribution of $4,800,000 on the Effective Date; (b) a pro rata Distribution of $2,000,000 on the third (3rd) year anniversary of the Effective Date; and (c) payment of any remaining obligations on the fourth (4th) year anniversary of the Effective Date. The only General Unsecured Claims asserted against the Debtor to date are as follows:

| Claim/Sched. | Claimant | Claim Amount | Anticipated Allowed Claim |
|---|---|---|---|
| 2 | Robert C. Smith, PLC **(Disputed)** | $201,338.21 | $100,000.00 |
| 3 & 4 | Robert C. Smith, PLC **(Disputed)** | $555,680.07 | $0.00 |
| 5 | River Title & Escrow, LLC | $960.50 | $960.50 |
| 6 | John McManus, Esq./ Hirschler Fleicher PC | $18,702.10 | $18,702.10 |
| 7 | McKenzie Snyder, Inc. | $11,297.50 | $11,297.50 |
| 8 | Diatomite Corporation of America **(Disputed)** | $7,280,000.00 | $7,000,000.00 |
| 11 | Greene and Company **(Disputed)** | $10,000.00 | $0.00 |
| 12 | NYS Dept. of Taxation & Finance | $2,064.69 | $2,064.69 |
| Sched E/F | Andrews Development Inc. **(Disputed)** | $5,000.00 | $0.00 |
| Sched E/F | Benito R. Fernandez **(Insider)** | $950,000.00 | NA[5] |
| Sched E/F | ECS Mid Atlantic LLC | $2,679.70 | $2,679.70 |
| Sched E/F | Howard Kleinhendler **(Insider)** | $188,000.00 | NA |
| Sched E/F | Jeff Howeth PC | $50,000.00 | $50,000.00 |
| Sched E/F | Reed Smith LLP | $23,591.25 | $23,591.25 |
| Sched E/F | Rubino & Company **(Withdrawn)** | $0.00 | $0 |
| | **Total** | **$9,299,314.02** | **$7,209,295.74** |

Class 3 General Unsecured Claims are not impaired under the Plan and, thus, the holders of such Claims are deemed to have accepted the Plan.

---

[5] The General Unsecured Claim held by Benito Fernandez and Howard Kleinhendler will be reclassified as capital contributions (*i.e.*, equity).

       **7.**     **Class 4 – Interests**

Class 4 consists of the Interests of Fernandez and Kleinhendler in the Debtor.  Under the Plan, said Interests will be cancelled on the Effective Date.  Because they are "insiders" of the Debtor, Fernandez and Kleinhendler are not entitled to vote as to the acceptance or rejection of the Plan on account of their Class 4 Interests.

**C.**     **Distributions Under and Implementation of the Plan**

The primary vehicle for the implementation of the Plan is the Exit Package.  The Debtor will shortly be filing a motion with the Bankruptcy Court seeking authority to obtain the Exit Package.  As such, the Debtor anticipates that the Exit Package Approval Order will have been entered prior to the Confirmation Hearing.

On the Effective Date of the Plan, the Debtor will be recapitalized such that the Interests in the Reorganized Debtor shall be allocated between Fernandez, Kleinhendler and the Chen Group pursuant to the terms of a mutually agreeable Operating Agreement.  The Distributions contemplated to be made on the Effective Date of the Plan will be made by the Debtor's counsel, Pick & Zabicki LLP, as Disbursing Agent, from the proceeds of the Exit Package.  All post-Confirmation payments contemplated under the Plan shall be made by the Reorganized Debtor either from its future earnings or the balance of the proceeds of the Exit Package.  The Reorganized Debtor will be responsible for making these payments.

No payment or Distribution shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Disputed Claim are withdrawn or resolved by Final Order. On any date that Distributions are to be made under the terms of the Plan, the Disbursing Agent shall deposit in one or more accounts (either an attorney escrow account or a segregated account with a banking institution that is a depository authorized by the United

States Trustee for bankruptcy cases in the Eastern District of New York), Cash equal to 100% of the Cash that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto, including, but not limited to (i) Disputed Claims that may be entitled to treatment as Administrative Expenses or as priority claims pursuant to §§503 and 507 of the Bankruptcy Code, (ii) claims of governmental units for any tax and (iii) any amount due but not payable on the Effective Date on account of Administrative Expenses or claims entitled to priority pursuant to §§503 and 507 of the Bankruptcy Code. The Disbursing Agent shall hold such amounts in trust for the benefit of the holders of all such Disputed Claims pending determination of their entitlement thereto.  Within ten (10) days after the entry of a Final Order resolving an objection to a Disputed Claim, the Disbursing Agent shall make such Distributions to which a holder is then entitled with respect to any Disputed Claim that has become an Allowed Claim.

The Reorganized Debtor's affairs shall be managed, conducted and overseen by one or more Managers, the identity(ies) of whom will be disclosed prior to the Confirmation Hearing. Any Managers shall only take a salary or otherwise receive compensation from the Reorganized Debtor if there are funds sufficient therefor after payment of the Reorganized Debtor's ongoing obligations and those under the Plan.

## V.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Under §365 of the Bankruptcy Code, a debtor has the right, subject to approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  Although not defined in the Bankruptcy Code, an "executory contract" is usually described as a contract under which material performance (other than the payment of money) is due by each party. If an

executory contract or unexpired lease is rejected under §365 of the Bankruptcy Code, the "rejection" is treated as a breach of the contract or lease prior to the Petition Date giving rise to a pre-petition unsecured claim. In addition, "rejection" damages are limited in certain contexts under §502 of the Bankruptcy Code. If an executory contract or unexpired lease is assumed, the Debtor has the obligation to cure any default and to perform its obligations thereunder in accordance with the terms of such agreement.

The Plan provides for the Debtor's assumption of the Consent Decree as of the Effective Date in accordance with the provisions and requirements of §§365 and 1123 of the Bankruptcy Code. The Debtor is not aware of any other unexpired leases or executory contracts to which it may have been a party as of the Petition Date. The Plan nevertheless provides that any such executory contracts or unexpired leases which were not previously rejected, assumed, or assumed and assigned by the Debtor shall be deemed rejected and disaffirmed under the Plan as of the Effective Date in accordance with the provisions and requirements of §§365 and 1123 of the Bankruptcy Code. All proofs of claim with respect to any Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court within thirty (30) days after the mailing of notice of the entry of the Confirmation Order. The failure of any such counter party to file a proof of claim within the period proscribed shall forever bar it from asserting against the Estate any Claim for damages arising from the rejection of its executory contract or unexpired lease with the Debtor. The filing of any such proof of claim shall be without prejudice to any and all rights that the Debtor may have to object to the allowance thereof on any and all available grounds.

## VI.    OBJECTIONS TO AND ESTIMATION OF CLAIMS

From and after the Effective Date, the Debtor shall be the sole representative of the Estate with regard to objections to Claims.  Under the Plan, the Debtor may continue to prosecute any objection to any Claim filed prior to Confirmation after the Effective Date.  Any Claim subject to an objection which has not been adjudicated by Final Order or otherwise resolved prior to Confirmation will be treated as a Disputed Claim under the Plan.  Any further objections to Claims shall be filed by the Debtor no later than ninety (90) days after the Effective Date, which deadline may be extended by the Court upon motion of the Debtor without notice.  In the event that any Proof of Claim is filed, asserted or amended after the Effective Date, the Debtor shall have ninety (90) days from the date of such filing or notice to object to such Claim, which deadline may be extended by the Court upon motion of the Debtor without notice.  All objections shall be litigated to Final Order.  The Plan reserves the right of the Debtor to compromise, settle, withdraw or resolve by any other method approved by the Bankruptcy Court, any such objections to Claims.

Under the Plan, the Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to §502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such contingent or unliquidated Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  All of the aforementioned Claim objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted method.

## VII.    CAUSES OF ACTION

Except as otherwise provided in the Plan, any and all Causes of Action[6] shall remain assets of the Estate pursuant to §1123(b)(3)(B) of the Bankruptcy Code on the Effective Date. Pursuant to §1123(b)(3)(B) of the Bankruptcy Code, only the Debtor, or the Reorganized Debtor, as the case may be, shall have the right to pursue or not to pursue, or, subject to the terms of the Plan, compromise or settle Causes of Action owned or held by the Debtor and/or its Estate as of the Effective Date. From and after the Effective Date, the Debtor may commence, litigate, and settle any Causes of Action or rights to payment or claims that belong to the Debtor that may be pending on the Effective Date or instituted by the Debtor after the Effective Date, except as otherwise expressly provided in the Plan. Other than as set forth herein, no other Person may pursue such Causes of Action after the Effective Date, absent further order of the Court modifying the Plan. The Bankruptcy Court shall retain jurisdiction to adjudicate any and all Causes of Action whether commenced prior to or after the Effective Date.

Creditors should note that, absent a modification of the Plan, the benefits, if any, whether in the form of monetary recoveries, setoffs, recoupments, defenses and the like, of all Causes of Action shall inure to the benefit of the Debtor and not any Creditors. As such, absent further order of the Court modifying the Plan, recoveries by Creditors under the Plan shall not be affected by the pursuit, non-pursuit or outcome of any Causes of Action.

The Debtor has reviewed its records and represents that all of its pre-Petition Date payments and transfers, including those to insiders, if any, were made in the ordinary course.

---

[6] "Causes of Action" is defined in the Plan as "all claims, actions, third-party claims, counterclaims and crossclaims (including, without limitation, an avoidance, recovery, or subordination actions against insiders and/or any other persons or entities under §§510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code) in favor of the Debtor and/or the Estate existing on the Effective Date against any entity based in law or equity, whether direct, indirect, derivative or otherwise, and whether asserted or unasserted as of the date of entry of the Confirmation Order."

Accordingly, other than the Cipollone Action, the Debtor does not believe that there are potential Causes of Action under Chapter 5 of the Bankruptcy Code in its favor which would benefit its Estate and, as such, the Debtor does not anticipate that any post-Confirmation litigation to recover on Causes of Action under Chapter 5 of the Bankruptcy Code will be pursued.  The Debtor nevertheless reserves all rights concerning any Causes of Action arising under Chapter 5 of the Bankruptcy Code to the extent that any such Causes of Action may exist. Causes of Action of any kind or nature may be asserted by the Debtor or the Reorganized Debtor defensively, however.

## VIII.   LEGAL EFFECTS OF CONFIRMATION OF THE PLAN

### 1.      Binding Effect

Pursuant to §1141(a) of the Bankruptcy Code, once confirmed, the provisions of the Plan shall be binding upon the Debtor, all creditors and other parties in interest, regardless of whether they cast a Ballot to accept or reject the Plan.

### 2.      Discharge

Pursuant to §1141(d)(1) of the Bankruptcy Code, except as otherwise specified in the Plan, the Confirmation Order and/or §1141 of the Bankruptcy Code, the Confirmation of the Plan shall discharge the Debtor from any and all debts arising prior to the date of Confirmation.

### 3.      Limitation of Liability in Connection with the Plan

Pick & Zabicki LLP, as Disbursing Agent in connection with the Distributions under the Plan, shall incur no liability, whatsoever, for any action taken, or failure to act, except for its own gross negligence, willful misconduct, breach of fiduciary duty, criminal conduct and/or any disclosure of confidential information that causes damages.   Further, the Debtor and its

Professionals shall have or incur no liability to the extent allowed under §1125(e) of the Bankruptcy Code and, in all respects, the Debtor and its Professionals shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. Nothing in the Plan shall limit the liability of the Professionals of the Debtor pursuant to N.Y. Comp. Codes R. & Regs. Title 22, Section 1200.0, Rule 1.8(h)(1).

### 4.    Revesting of Assets

Consistent with §§1123(a)(5)(A) and 1141 of the Bankruptcy Code, and except as may be otherwise provided in the Plan, title to all assets and property of the estate of the Debtor shall pass to, and vest in, the Reorganized Debtor free and clear of all Claims, Liens, charges and other rights of creditors arising prior to the Effective Date.  On and after the Effective Date, the Reorganized Debtor may conduct its financial affairs and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court, except as otherwise provided in the6 Plan or in the Confirmation Order.

## IX.    RETENTION OF JURISDICTION

The Bankruptcy Court shall retain jurisdiction over this proceeding under the provisions of the Bankruptcy Code, including, without limitation, §1142(b) thereof and the Bankruptcy Rules, to ensure that the intent and the purpose of the Plan is carried out and given effect. Without limitation by reason of specification, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(a)    To consider any modification of the Plan pursuant to §1127 of the Bankruptcy Code and/or any other modification of the Plan after substantial consummation thereof;

(a)  To hear and determine:

    (i)  all controversies, suits and disputes, if any, as may arise in connection with the interpretation, implementation, consummation or enforcement of the Plan;

    (ii)  all controversies, suits and disputes, if any, as may arise between or among the holders of any Class of Claim and the Debtor including, without limitation, proceedings to determine the allowance, classification, amount, or priority of Claims;

    (iii)  all rights or Causes of Action which may exist on behalf of the estate, including actions commenced to recover preferential transfers, accounts receivable and other property of the estate;

    (iv)  applications for allowance of compensation and expense reimbursement of professionals for periods prior to the Effective Date;

    (v)  any and all applications, adversary proceedings and litigated matters;

    (vi)  to enter a final decree closing the Chapter 11 Case; and

    (vii)  to the extent not expressly provided for above, any and all disputes arising under the Plan and proceedings in aid of the administration and/or consummation of the Plan.

## X.  CONDITIONS TO CONFIRMATION, EFFECTIVE DATE AND CONSUMMATION OF THE PLAN

It is a condition to Confirmation of the Plan that (a) the Confirmation Order shall approve in all respects all of the provisions, terms and conditions of the Plan, and (b) the Confirmation Order is satisfactory to the Debtor in form and substance.

The Plan shall not become effective unless and until each of the following conditions has been satisfied or waived:

(a)  The Bankruptcy Court shall have entered the Confirmation Order;

(b)  The Bankruptcy Court shall have entered the Exit Package Approval Order;

(c)  The Confirmation Order and the Exit Package Approval Order shall have become a Final Orders; and

(d)    All actions requires to be taken to implement the Confirmation Order including, but not limited to, the deposit of the proceeds of the Exit Package needed to fund the Distributions provided for under the Plan with the Disbursing Agent, having occurred.

The Debtor may at any time, without notice or authorization of the Bankruptcy Court, waive any or all of the foregoing conditions.  The failure of the Debtor to satisfy or waive such condition may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any actions taken by the Debtor).  The Debtor reserves the right to assert that any appeal from the Confirmation Order shall be moot after substantial consummation of the Plan. In the event that the aforementioned conditions have not occurred or been waived on or before two hundred and forty (240) days after the Confirmation Date, the Confirmation Order may be vacated upon order of the Bankruptcy Court made on the request of the Debtor or any party in interest and an opportunity for parties in interest to be heard.

## XI.    IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

The tax consequences of the Plan may impact the decision of the holder of a Claim in determining whether to accept or reject the Plan.  Moreover, the tax consequences will vary depending upon the individual circumstances of holder of a Claim.

The following discussion summarizes certain material U.S. federal income tax consequences of the Plan to the holders of Class 3 General Unsecured Claims.  The summary is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect.  This summary does not address all

aspects of federal income taxation that may be relevant to a particular holder of a Claim in light of its particular facts and circumstances or to particular types of holders of Claims subject to special treatment under the Tax Code and also does not discuss any aspects of state, local, or foreign taxation. Additionally, a substantial amount of time may elapse between the Effective Date and the receipt of the final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling will be sought from the Internal Revenue Service with respect to any of the tax aspects of the Plan and no opinion of counsel has heretofore been obtained by the Debtor as proponent of the Plan with respect thereto. **Accordingly, each holder of a Claim should consult his, her or its own tax advisor to determine what effect, if any, the treatment afforded its respective Claim under the Plan may have under federal, state and/or local tax laws, and the laws of any applicable foreign jurisdictions.**

On the exchange of its Claim for cash and/or property, each holder of a Claim in Class 3 will recognize gain or loss measured by the difference between: (a) the aggregate fair market value of the cash and/or property received; and (b) such holder's tax basis in the Claim. To the extent that the cash and/or property received by a holder of a Claim is attributable to accrued interest on such Claim, the cash and/or property received will be deemed made in payment of such interest. Conversely, a holder of a Claim will recognize a deductible loss to the extent any accrued interest previously included in its gross income is not paid in full. The allocation for federal income tax purposes between principal and interest of amounts received in exchange for the discharge of a Claim at a discount is not clear. However, the Debtor intends to treat any

28

amount received by holders of Claims as first allocated to principal.

Where gain or loss is recognized by a holder in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including but not limited to: (a) the nature or origin of the Claim; (b) the tax status of the holder; (c) whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held; (d) whether the Claim was acquired at a market discount; and (e) whether and to what extent the holder had previously claimed a bad debt deduction with respect to the Claim. Any cash and/or property received by a holder of a Claim after the Effective Date may be subject to the imputed interest provisions of the Tax Code.

No statement in this Disclosure Statement should be construed as legal or tax advice. The Debtor and its counsel and accountants do not assume any responsibility or liability for the tax consequences the holder of a Claim may incur as a result of the treatment afforded its Claim under the Plan.  Again, all holders of Claim are urged to consult with their own tax advisor regarding the potential tax consequences of the Plan.

**CIRCULAR 230 DISCLOSURE: This tax discussion was written to support the promotion or marketing of the Plan.  To ensure compliance with requirements imposed by the Internal Revenue Service, we are informing you that this discussion was not intended or written to be used, and cannot be used, by any person for the purpose of avoiding tax-related penalties that may be imposed on the taxpayer under the Tax Code.  Taxpayers should seek advice based on their particular circumstances from an independent tax advisor.**

## XII    ALTERNATIVES TO CONFIRMATION OF THE PLAN

The Debtor believes that the Plan affords Holders of Claims the potential for the greatest recovery on those Claims and is therefore in the best interests of such Holders. If the Plan is not confirmed, the alternative near future outcomes for the Debtor include: (a) continuation of the Chapter 11 Case and the filing of an alternative plan of reorganization or (b) the liquidation of the Debtor (pursuant to Section 363 of the Bankruptcy Code) under Chapter 11 of the Bankruptcy Code.   In the event that the Plan is not approved by Bankruptcy Court Order the Debtor intends to first visit the issues which precluded confirmation of the existing Plan and address those issues in a new Plan which would propose a superior transaction or, in the alternative propose a liquidating plan which would provide for the sale of the Property pursuant to Bankruptcy Court Order

## XIII.   GENERAL INFORMATION REGARDING CONFIRMATION PROCEDURE AND VOTING

### A.    Plan Confirmation Process

The requirements for Confirmation of the Plan are set forth in detail in §1129 of the Bankruptcy Code.   The following summarizes some of the more salient requirements for such Confirmation:

(a)    <u>Acceptance by Impaired Classes</u>.  A chapter 11 plan may be confirmed if each impaired class of claims or interests accepts the plan.   Classes of claims or interests which are not impaired are deemed to have accepted the plan. A class is impaired if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified other than by curing defaults and reinstating maturities or by payment in full in cash.

As discussed above, there are no impaired Classes under the Plan and, thus, each Class of Claims and Interests is deemed to have accepted the Plan and may not vote to accept or reject the Plan.

(b)    <u>Feasibility</u>.  The Bankruptcy Court is required to find that the Plan is likely to be implemented and that the parties required to perform or pay monies under the Plan are likely to be able to do so.

(c)    <u>"Best Interests" Test</u>.  The Bankruptcy Court must find that the Plan is in the "best interests" of creditors.  To satisfy this requirement, the Bankruptcy Court must determine that each holder of a Claim against the Debtor: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount which such holder would receive if the Debtor's property were liquidated under chapter 7 of the Bankruptcy Code on that date.

2.    **Confirmation Hearing**

To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the Requirements of §1129 of the Bankruptcy Code (the "Confirmation Hearing"). **The Confirmation Hearing will be held at the United States Bankruptcy Court for the Eastern District of New York, before the Honorable Nancy Hershey Lord, United States Bankruptcy Judge, 271-Cadman Plaza East, Courtroom 3577, Brooklyn, New York 11201, on _____, 2020 at _____ a.m./p.m.**

3.    **Objections to Confirmation**

**The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan shall be: (a) be in writing and state with particularity the grounds therefor, (b) conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the United States**

**Bankruptcy Court for the Eastern District of New York, (c) state the name and address of the objecting party and the amount and nature of such party's claim or interest against the estate or any property of the Debtor, (d) be filed with the Court with a copy to the chambers of the Honorable Nancy Hershey Lord, together with proof of service thereof, and (e) be served in a manner so as to actually be received by : (a) Pick & Zabicki LLP, 369 Lexington Avenue, 12th Floor, New York, New York 10017, Attn: Douglas J. Pick, Esq.; and (b) the Office of the United States Trustee, 201 Varick Street, Suite 1006, New York, New York 10014, on or before April ____, 2020 at 5:00 p.m.  Any creditor or party-in-interest submitting an objection to Confirmation of the Plan must also appear at the Confirmation Hearing to pursue same.**

      **4.      Effect of Confirmation**

As discussed above, upon entry of the Confirmation Order, the Plan shall be binding upon the Debtor, all creditors and other parties in interest, regardless of whether they cast a Ballot to accept or reject the Plan.

## XIV.  FEASABILITY OF THE PLAN

In order to confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court must find that the Plan is likely to be implemented and that the parties required to perform or pay monies under the Plan are likely to be able to do so.  The Bankruptcy Court must further find that Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor.

The funds needed to make the Effective Date Distributions of the Plan will be on deposit with the Debtor's counsel at the time of Confirmation.  The Plan further provides for ongoing post-Confirmation payments.  For purposes of determining whether the Plan meets the

"feasibility" requirements of the Bankruptcy Code, the Debtor and its Professionals analyzed the future prospects, future income and future liabilities of the Debtor, including those under the Plain, and incorporated their findings into, among other analyses, the Projections attached hereto as *Exhibit "E"*. As confirmed by the Projections, the Debtor believes that, after the restructuring of its debt obligations provided for under the Plan, the Reorganized Debtor will be able to make all of its ongoing Plan payments while remaining current on its ordinary debts. Thus, the Debtor believes that the Plan is feasible and that Confirmation is not likely to be followed by the liquidation or further financial reorganization of the Debtor.

## XV. BEST INTERESTS

Notwithstanding acceptance of the Plan by the requisite number of impaired Classes of Claims, the Bankruptcy Court must independently determine that the Plan provides each member of each impaired Class of Claims a recovery that has a value at least equal to the value of the Distribution that each such creditor would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The Debtor believes that the Plan is in the best interests of creditors because it maximizes the value of the Debtor while providing an immediate and definite recovery by creditors which would not be achievable if the Debtor were liquidated. Under the scenario presented under the Plan, all holders of Claims will receive Distributions totaling the full principal amount of their Allowed Claims, with applicable interest, if any, either on the Effective Date or over a brief period of time (with a substantial upfront payment on the Effective Date). In contrast, in the event of a liquidation of the Debtor under chapter 7 of the Bankruptcy Code, it is likely that any distribution to holders of General Unsecured Claims would likely be substantially delayed while the expenses of the estate continued to grow in the form of accruing interest and other charges

associated with the Secured Claims asserted against the Debtor and its assets, impediments to any sale of the Residential Unit as a result of its current condition and legal status, the substantial additional expenses of administration, including a chapter 7 trustee's commissions and fees for such trustee's counsel, accountants, and other professionals likely to be retained.  Thus, the Debtor respectfully submits that the Plan is in the best interests of creditors.

## XVI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor has evaluated alternatives to the Plan, including alternative Plan structures and terms; the adoption of a plan of liquidation; and the pursuit of various litigation strategies. While the Debtor has concluded that the Plan is the best alternative and will maximize recoveries by holders of Allowed Claims, if the Plan is not confirmed, the Debtor or any other party-in-interest could attempt to formulate and propose a different plan or plans of reorganization. Further, if no plan of reorganization can be confirmed the Debtor's chapter 11 case may be dismissed or converted to a chapter 7 case.  In a liquidation case under chapter 7, the proceeds of the liquidation would be distributed to the respective creditors of the Debtor in accordance with the priorities established by the Bankruptcy Code and contractual priorities.  However, the Debtor believes that holders of Allowed Claims would receive substantially less under chapter 7 and will be paid more quickly under the Plan as discussed more fully above. Accordingly, the Debtor believes that Confirmation and consummation of the Plan is preferable to the alternatives described above.

## XVII.  RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtor believes that the Confirmation and consummation of the Plan is the best means available to provide the greatest level of recovery to creditors in accordance with their legal and contractual rights. Consequently, the Debtor urges all holders of Allowed Claims and Allowed Interests to support Confirmation of the Plan.

Dated: New York, New York
       February 7, 2020

                                        Respectfully submitted,

                                        **VIRGINIA TRUE CORPORATION**
                                        Debtor-in-Possession


                              By:      **/s/Benito R. Fernandez**
                                       Benito R. Fernandez, President

**READ AND APPROVED:**

        **PICK & ZABICKI LLP**
        Counsel to the Debtor


By:      **/s/Douglas J. Pick**
         Douglas J. Pick
         369 Lexington Avenue, 12th Floor
         New York, New York 10017
         (212) 695-6000