Douglas J. Pick, Esq.
Eric C. Zabicki, Esq.
**PICK & ZABICKI LLP**
Counsel to the Debtor
369 Lexington Avenue, 12th Floor
New York, New York 10017
(212) 695-6000

Hearing Date: August 31, 2021
Time: 2:30 p.m.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:

VIRGINIA TRUE CORPORATION,

                     Debtor.

Chapter 11
Case No. 19-42769 (NHL)

-----------------------------------------------------------------x
VIRGINIA TRUE CORPORATION,

                     Plaintiff,

DIATOMITE CORPORATION OF AMERICA,

                     Intervenor-Plaintiff,

   -against-

ANTHONY CIPOLLONE and
DOMENICK CIPOLLONE,

                     Defendants.

Adv. Proc. No. 19-01118 (NHL)

-----------------------------------------------------------------x

**DEBTOR'S RESPONSE TO OBJECTION OF DIATOMITE CORPORATION OF
AMERICA TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
PROPOSED SETTLEMENT OF ALL CLAIMS BETWEENAND AMONG
THE DEBTOR, THE DEBTOR'S INSIDERS AND THE CIPOLLONES**

TO:   THE HONORABLE NANCY HERSHEY LORD
        UNITED STATES BANKRUPTCY JUDGE

        Virginia True Corporation, the debtor and debtor-in-possession herein (the "Debtor"), by and through its undersigned counsel, as and for its response to the objection (the "Objection") of Diatomite Corporation of America ("Diatomite") interposed in connection with the Debtor's motion (the "Motion") for entry of an Order, pursuant to § 105(a) of title 11 of the

United States Code (the "Bankruptcy Code") and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving the settlement of all claims between and among the Debtor, Howard Kleinhendler, Benito R. Fernandez, Anthony Cipollone and Domenick Cipollone (together, the "Cipollones") upon the terms more fully described in a certain *Settlement Agreement* (*see* Motion at Ex. A), respectfully represents and alleges as follows:

1. The content of the Objection, as well as the circumstances surrounding its filing, puts to rest once and for all any conceivable notion that Diatomite is a good faith participant in this case. From its commencement more than two (2) years ago, Diatomite has brought *nothing* to the table in this case other than its blatant obstinance and deliberate efforts to sabotage and micro-manage the chapter 11 process. This Court is well aware of the multiple petty and counterproductive "objections for objection's sake" that Diatomite has filed or raised as to virtually all requests for relief made by the Debtor. Such tactics have unnecessarily and profoundly thwarted the efficient administration of this case while exponentially driving up the costs, financially and in terms of time, attention and resources, incurred by the Debtor, its other creditors and this Court.

2. Indeed, despite a lengthy mediation (under the guidance of none other than the universally respected former Bankruptcy Judge Robert E. Gerber) and its many, many proclamations of a willingness and desire to reach a compromise, and despite the countless alternative settlement scenarios relayed to it by the Debtor, Diatomite *has never once made a single firm settlement proposal* that would serve to advance this case toward a conclusion beneficial to all stakeholders. Diatomite's machinations in this regard are nothing more than a bad faith attempt to mislead the parties and this Court so as to delay any progress in this case *ad infinitum*. Unfortunately for Diatomite, the "music" has stopped (or at least the tune has

significantly changed) on Diatomite's game as a result of the proposed assignment of the Cipollones' claims to Pan American Claim Investors, LLC ("Pan American") and the corresponding proposed agreements between the Debtor and Pan American with regard thereto which will finally provide the Debtor with a path to a successful reorganization. The Cipollones (whom the Debtor expects will be filing their own response to the Objection) made a decision that endless, complex and costly litigation was not in their best interests and, thus, agreed to assign its claim to Pan American. Diatomite has similarly been given every opportunity in the world to negotiate an amicable resolution of its claim in good faith but has simply refused to do so. As such, Diatomite only has itself to blame for the isolated position in which it now finds itself and thereby leaving Diatomite with no alternative but to attack the overwhelmingly beneficial proposed settlement between the Debtor and Pan American.

3. Diatomite's bad faith is also clearly evidenced by its recent actions with regard to the Motion. Specifically, the Motion was filed on June 2, 2021 and was initially returnable on June 29, 2021. Counsel to Diatomite subsequently represented to the undersigned, to counsel to the Cipollones and to counsel to Pan American that Diatomite simply needed additional time to investigate the proposed settlement and affirmatively (and convincingly) stated that Diatomite wished to seriously explore a settlement regarding its claim (and thereby resulting a "global" resolution of the primary claims and disputes in this case). Based on those representations, all parties agreed to adjourn the Motion to July 13, 2021.

4. Over the course of the ensuing weeks, both by telephone and e-mail, the undersigned answered countless inquiries from counsel to Diatomite regarding, among other things, the terms of the proposed Settlement Agreement and the resulting benefits thereof to the Debtor, its creditors (including Diatomite) and its estate. During these discussions and communications, the undersigned communicated the material terms of multiple settlement

proposals that were acceptable to the Debtor with regard to Diatomite's claim. Counsel to Diatomite affirmatively and repeatedly represented to the undersigned that Diatomite was fully vested in reaching a settlement and that Diatomite would shortly be making a settlement proposal of its own.

5. On July 9, 2021, the Court sent an e-mail to counsel to the parties inquiring as to whether the July 13, 2021 adjourned hearing on the Motion would be going forward. Counsel to Diatomite responded that "[t]he parties' discussions are ongoing" and, thus, "it would be prudent" to further adjourn the Motion to July 27, 2021. Believing that Diatomite was proceeding in good faith, the undersigned consented to the adjournment as did counsel to the Cipollones and counsel to Pan American. Over the course of the ensuing weeks, the undersigned continued to communicate with counsel to Diatomite, including frequent e-mails to counsel inquiring as to when Diatomite would be making its promised settlement proposal. Copies of a sampling of the relevant e-mail communications are attached hereto as *Exhibit "A"*. The undersigned's last communication with counsel to Diatomite was a telephone call on July 19, 2021 (which counsel to Diatomite initiated) which counsel used to ask multiple questions regarding the proposed settlement with Pan American, all of which the undersigned answered in good faith.

6. Unfortunately, it soon became evident that Diatomite had been "playing games" with the parties (and this Court) all along. Specifically, the following day, July 20, 2021, Diatomite filed the lengthy Objection which it had undoubtedly been preparing all along despite multiple representations from Diatomite that it wished to reach an amicable resolution. Diatomite's promises and representations that it intended to make a settlement proposal of its own proved to be just a diversion. Diatomite simply needed additional time to finalize its opposition papers and used the pretense of settlement discussions to allow it to surreptitiously

probe the other attorneys for information which Diatomite could then use in its papers to attack the proposed settlement. Clearly Diatomite never had any intention of doing anything other than what they have always done: impede and attempt to scuttle any meaningful steps taken to advance this case while contributing nothing.

7. Ordinarily it would go without saying that the primary, if not the only, goal of a creditor in a bankruptcy case, particularly a general unsecured creditor, would be to recover as much money on its claim as possible, as quickly as possible, while expending as little money on professional fees as possible in the process. However, a reading of the Objection confirms that Diatomite's maneuverings in this case are motivated by its obsession with of one of the Debtor's principals, Howard Kleinhendler. Indeed, rather than giving any good faith consideration to the potential benefits of the proposed settlement to itself and other creditors, much of the Objection is focused on Diatomite's petty insistence that Mr. Kleinhendler receive no benefit or gain whatsoever on account of his equity interests in the Debtor, all else be damned. Diatomite goes so far as to attempt to besmirch Mr. Kleinhendler's personal character by accusing him of taking advantage of the elderly and infirm Allan Applestein (Diatomite's sole shareholder)[1], accusing him of having committed legal malpractice (a matter which Diatomite acknowledges is vehemently disputed and is the subject of active litigation)[2] and pejoratively referring to his involvement as counsel in certain post-2020 election lawsuits. Suffice it to say

---

[1] Mr. Kapoor's assertion that Mr. Applestein suffers from Alzheimer's disease (see p. 2, ¶ 4 of the Objection) begs the question whether Diatomite has any competent witness who could testify as to their personal knowledge of the facts and circumstances asserted by Diatomite. Indeed, the Debtor has had misgivings throughout this case as to who, if anyone, has the authority to instruct Mr. Kapoor and his firm in their representation of Diatomite. Evidently Mr. Applestein's daughter, Andrea Bivens, purports to have authority to act for her father. However, during the course of her examination before trial in connection with Diatomite's malpractice action against Mr. Kleinhendler, Ms. Bivens testified that, although he had signed a document of some kind, her father was essentially incoherent and did not know what he was signing. Copies of the relevant excerpts of Ms. Bivens' examination are attached hereto as *Exhibit "B"*.

[2] It should not be disputed by Diatomite that, in response to its inquiry with regard thereto, the undersigned confirmed in writing that the malpractice action would not be affected at all by the settlement.

5

that such allegations and aspersions have no relevance whatsoever to the Motion and are, instead, merely "red herrings" intentionally included so as to try to distract this Court's attention from the *bona fides* of the proposed settlement.

8. Similarly without merit are Diatomite's arguments with regard to the merits of the proposed settlement. The respective assertions made by Diatomite in this regard can be summarily addressed as follows:

(a) "[T]he Debtor gains essentially nothing for relinquishing" its claims against the Cipollones. (*See* Objection at ¶ 1).

> **Response**: The inanity of Diatomite's position that the proposed settlement will not benefit the Debtor is not only belied by the factual narrative and legal arguments set forth in the Motion, but has been illustrated to Diatomite's counsel in numerous communications since the filing of the Motion. Specifically, not only will the proposed settlement result in the release by Pan American to the Debtor of 200 acres of land (having a value of not less than $2,000,000 and conceivably much higher)[3] from the Deed of Trust being assigned to it by the Cipollones and a reduction in the secured claim being acquired from the Cipollones from $5,000,000 million (plus interest) to $4,000,000 million (to be paid five (5) years after confirmation with interest thereon at the rate of 5% per annum), it will provide the Debtor with a cooperative financial partner in Pan American whose presence will serve to immediately end multiple complex pending litigations in this and other Courts, provide the Debtor with the ability to immediately obtain the approval of this Court and the Virginia Court of the proposed settlement of the environmental enforcement action and, thereafter, to consummate the settlement (an important first step toward a global resolution of the chapter 11 case), eliminate all delays in getting to confirmation of a plan in this case, and permit the Debtor to focus its resources on putting together a business plan toward developing the property. Diatomite's sole basis for its assertion that the settlement would not benefit the Debtor appears to be based entirely upon its belief that the Debtor's equitable subordination and/or fraudulent conveyance claims against the Cipollones are (despite the fact that they have been the subject of hotly contested litigation for more than two (2) years) "slam dunks". As explained below (and as presumably will be further rebutted by the

---

[3] On April 27, 2017 the Debtor acquired a 967-acre parcel of land from Diatomite for the sum of $12,000,000 (See Objection at ¶ 19) (accordingly 200 acres would have a value of $2,481,903). Diatomite has filed its appraisal of 964.11 acres as of December 11, 2018 at $8,200,000 (ECF No.283; Exh 5) (accordingly 200 acres would have a value of $1,701,068). The Cipollones have offered their appraisal of 964 acres as of May 3, 2019 at $13,500,000 (ECF No 283; Exh 6) (accordingly 200 acres would have a value of $2,800,830). In December, 2019 the Conservation Fund had acquired Rappahannock Cliffs for $15,700 per acre (or the equivalent of $3,156,000 for 200 acres) (ECF No.283; Exh 6 at p.6). Of note is that in April 2006 the initial asking price for the 967 acres from Mr. Applestein was $25,000,000, which was reduced by Mr. Applestein in January, 2009 to $19,900,000 (ECF No.283; Exh 6, at p.5). Thus between 2006 and 2019 the property has had wide market swing from a low of $8,200,000 (Diatomite) to a high of $25,000,000 (Mr. Applestein).

Cipollones in their reply to the Objection), there are multiple complex issues of fact (including the valuation of the property at multiple points in time)[4] and law (including multiple defenses) that can only be resolved after many additional years of complex and costly litigation. Moreover, the funds to be contributed by Pan American will be combined with funds to be invested by Messrs. Kleinhendler and Fernandez and a possible third-party. Thus the proposed settlement results in the elimination of substantial costs of litigation, reduces administrative fees and expenses, eliminates continuing delays consistently caused by Diatomite's proactive/knee jerk practice/reaction of objecting to anything and everything filed with the court, allows the Debtor to put together a business plan and projections to confirm a chapter 11 case, and preserves value for the benefit of *all creditors*. It is submitted that the compromise meets and exceeds the fair and equitable test employed by Bankruptcy Courts in determining, in its discretion, if the proposal merits approval.

(b) "Once the *Iridium* factors are applied, the answer to the paramount question of who benefits from the transaction is obvious: the Debtor's current and former insiders and equity investors do." (*See* Objection at ¶ 2).

**Response**: This is yet another "red herring" presented by Diatomite for the purpose of distraction. Simply said, all creditors of the Debtor will benefit from the proposed settlement. The fact that Messrs. Kleinhendler and Fernandez may also stand to receive a benefit on account of their equity interests in the Debtor at some unknown future date as a result of the settlement does not have any affect upon the merits of the Motion. The only stakeholder in this case who complains of being disadvantaged by the settlement is Diatomite which seemingly believes that, if it is allowed to litigate against the Cipollones, then it might succeed in subordinating the Cipollones claims and accordingly increase *its odds* of being paid in full (although Diatomite fails to address a pending malpractice action that it has commenced against Mr Kleinhendler and his firm that Diatomite is aggressively pursuing) from a liquidation sale of the property. To the extent that Diatomite obtains a recovery in the malpractice action it will only go to reduce its claims in this proceeding. Also, of equal impact, is that Diatomite is troubled that the Debtor is contemplating filing a reorganization plan (and not a liquidation plan) which will provide for a 100% distribution to creditors over time. Thus the settlement will not necessarily impact on Diatomite's rights

(c) "[T]he insiders negotiated releases of their personal liability by trading valuable claims of the estate…some of which is the subject of ongoing litigation elsewhere." (*See* Objection at ¶ 3).

---

[4] There are now not less than three (3) actions pending in this Court as listed in Mr. Kapoor's Declaration as well as two (2) other actions pending in the District Court that have spawned from these proceedings. Obviously, issues as to the valuation of the property, at different points in time, will come into play in those actions as well as the value of the Cipollones so called "worthless shares" (Diatomite's words; *see* p. 11, ¶ 40 to the Objection) and, correspondingly, Mr. Applestein's belief that the property had a market value as high as $25,000,000.

**Response**: At the outset, the Court should note that the proposed settlement does not provide for the release of any claims or potential claims against Messrs. Kleinhendler or Fernandez that are held by the Debtor or its estate. The only "releases" being granted to Messrs. Kleinhendler or Fernandez involve the claims asserted by the Cipollones in the District Court Action (as defined in the Motion) which will be dismissed with prejudice (as against the Debtor, Mr. Kleinhendler and Mr. Fernandez) once Pan American is substituted in for the Cipollones as plaintiff. In any case, Diatomite confuses the concepts of "settlement" with "surrender." The proposed settlement is not an unjustified abandonment of the Debtor's claims in the Adversary Proceeding (as defined in the Motion) (in which the Debtor, and not Diatomite, is the plaintiff), but rather is a good faith, arm's length negotiated compromise agreed to after conducting the proverbial "cost-benefit analysis" under the realities of this case. It is simply time to move on.

(d)    "The Cipollones' secured claim easily should be avoided, subordinated, or recharacterized, leaving the Cipollones or their assignee to recover only after the Debtor's true creditors have been paid in full." (*See* Objection at ¶ 6).

**Response**: Diatomite seems to have forgotten that it is the Court that decides if the facts and the law warrant the reclassification or subordination of the Cipollones' claims and not Diatomite. In an apparent effort to help the Court determine the merits of Diatomite's objection, Diatomite alleges (presumably in a proverbial "tongue in cheek" way) that its internal analysis and research of the underlying facts is pristine and that the settlement should be denied because the Cipollones' claims can be "easily" avoided and/or "easily" subordinated and/or "easily" recharacterized. Unfortunately nothing in life is certain (except possibly death, taxes and another objection from Diatomite). The proposed settlement is well within the range of possible alternatives including that the litigation, if pursued might ultimately settle with less beneficial terms to the Debtor and/or that the Cipollones might actually succeed in the litigation. Compromises are a certainty in the context of bankruptcy cases and a normal part of the reorganization process. There can be no dispute that litigation of the magnitude imagined by Diatomite (inclusive of possible appeals by either losing side) would be complex (applying a mixture of State and Federal law arguments as to avoidance, equitable subordination and recharacterzation), expensive (inclusive of expert testimony and disputed valuation hearings on the appraised value of the property at multiple points in time) and of a long duration (inclusive of multiple fact witnesses exclusive of Diatomite's prime witness, Mr. Applestein, who Diatomite and Mr Applestein's daughter both confirm as suffering from the debilitating disease of Alzheimer's). Other than its "crystal ball" prediction that it will succeed in litigating with the Cipollones, Diatomite makes no analogous predictions of future scenarios resulting from its scorched earth litigation except possibly that as a result of the Diatomite's scorched earth tactics against everyone including the principals of the Debtor that the Debtor will then be placed in the position of getting Diatomite's acquiescence (possibly the first and only time) to placing the property up for sale (which Diatomite had proposed in its previously filed reorganization plan) but without the benefit of knowing if a buyer can be found and at what price. Arguably, Diatomite's efforts could conceivably result in disastrous effects on the Debtor and all other creditors if the property were to lose value due to the increasing fears of the COVID Variant and/or

the loss of the Opportunity Zone tax benefits. The Motion allows the Debtor to move forward with a plan to pay all creditors 100% of their allowed claims.

(e) "For the release of their personal liability to the estate, the Debtor's insiders would cause the Debtor to pay dearly by surrendering claims that are based on virtually undisputed facts, that are based on established law, and for which the Debtor will expend little to prosecute due to Diatomite's willingness to advance litigation expenses as plaintiff-intervenor in the Debtor's adversary proceeding or as plaintiff in a parallel adversary proceeding." (*See* Objection at ¶ 8)

**Response**: Again, Diatomite points to no actual or potential "personal liability to the estate" on the part of Mr. Kleinhendler or Mr. Fernandez that is purportedly being released as part of the settlement. Diatomite simply conjures this notion from thin air. Also, nowhere in the realm of examining a settlement approval motion under Bankruptcy Rule 9019(a) is any consideration to be given to the proposal that a third-party will take up the "laboring oar" so that litigation can be continued rather than resolved. Obviously, Diatomite has only one self-serving goal, which it has evidenced throughout the chapter 11 case, which is simply to protect its economic interest particular only to itself as opposed to the best interests of the estate as a whole. Obviously the proffered settlement will positively result in the resolution of the Environmental Enforcement Action[5] (as defined in the Motion) and will result in the ability of the Debtor to proffer a plan that will hopefully provide for a 100% distribution to all creditors.

9.  In addressing the "*Iridium* Factors", Judge Glenn stated in *In re Allard*, 2021 Bankr. LEXIS 1634 at *18-*20 (Bankr. S.D.N.Y 2021), that:

> Pursuant to Rule 9019 of the Bankruptcy Rules, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromises or settlement." Fed. R. Bankr. P. 9019(a). Settlements are generally favored in bankruptcy because they "minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *In re MF Global, Inc.*, 2012 Bankr. LEXIS 3701, at *15 (Bankr. S.D.N.Y. 2021) (citing *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)). Before approving a settlement, a bankruptcy court must determine that it "is fair and equitable and in the best interests of the estate." *In re Drexel Burnham Lambert Grp. Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (citing *Protective Comm. For Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968)) (internal quotation marks omitted).

---

[5] Also pending before the Court is the Debtor's Motion for Entry of an Order Approving the Proposed Settlement of Environmental Claims, to which no objections have been filed (ECF No. 161).

> In determining whether a proposed settlement is fair and equitable, courts in the Second Circuit have set forth the following interrelated factors (each an "*Iridium* Factor" or a "Factor," and, collectively, "*Iridium* Factors" or "Factors" to consider:
>
> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining".
>
> *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (quoting *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).
>
> The court must "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (citation and internal quotation marks omitted). While "the court is not required to conduct a trial on the terms to approve a settlement . . . [,] the court must inform itself of 'all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.'" *In re Kerner*, 599 B.R. 751, 755 (Bankr. S.D.N.Y. 2019) (quoting *O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 70 (Bankr. E.D.N.Y. 2009)).
>
> "Although approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored." *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y. 2009 (citation omitted). In addition, the court "may give weight to the informed judgment of the trustee or debtor-in-possession and their counsel that a compromise is fair and equitable." *In re Drexel Burnham Lambert Grp. Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

10. The "*Iridium* Factors" appear to overwhelmingly favor approval of the Motion:

(a) The balance between the litigation's possibility of success and the settlement's future benefits and the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment;

**Response:**

As discussed above, the multiple litigations and disputes proposed to be settled involve complex issues which would cost the Debtor dearly in terms of professional and expert witness fees, carrying costs with regard to the Property (including real estate taxes, insurance, upkeep and the like), as well as substantial time and delay. Again, the Cipollones have raised viable factual and legal defenses to the claims asserted against them by the Debtor. In contrast, the proffered settlement would take away all doubt about the fees, expenses and time attendant to the resolution of a complex litigation which will require multiple witnesses (apparently exclusive of Mr. Applestein), expert witnesses and the introduction of multiple sets of competing appraisals. The proffered settlement also removes any issue of whether or not Venable had any client authority to have filed the complaint and/or to have asserted any objections in the first instance. A settlement also provides an immediate benefit to the estate by the release to the Debtor of 200 acres of land, a reduction of $1,000,000 dollars of the secured debt and a financially cooperative partner to assist in the confirmation process.

(b) "The paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement";

**Response:**

The settlement is in the best interest of all creditors because it enables the Debtor to proceed with the Rule 9019 settlement with the Virginia Department of Environmental Quality and the State Water Board upon the terms and conditions set forth in a proposed Consent Decree, and it provides the Debtor with unrestricted access to 200 acres of land with a value of not less than $2,000,000 (if not more) plus access to an additional $1,000,000 of proceeds not otherwise to be paid to the secured lender plus, again, a cooperative financial partner who will work with the Debtor in formulating and filing a plan of reorganization. Absent a settlement the Debtor (among others), would be subject to a $5,000,000 claim from the Cipollones, accruing default interest, fees and other charges including protracted litigation-related expenses which the Debtor (non-income producing) can ill afford.

11

(c)  Whether other parties in interest support the settlement;

**Response:**

The settlement is supported by the Debtor, the Cipollones and Pan American. It is respectfully submitted that no creditors absent Diatomite has filed an objection, that the Office of the United States Trustee has not filed an objection and that creditors will benefit through the Debtor's filing of a plan of reorganization that will provide for 100% distribution to creditors.

(d)  The "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing the settlement;

**Response:**  Douglas J. Pick as counsel to the Debtor is an experienced bankruptcy attorney with approximately 42 years of experience. Stephen Starr as counsel to the Cipollones is an experienced bankruptcy attorney with approximately 30 years of experience. Harold Somer as counsel to Pan American is an experienced bankruptcy attorney with approximately 37 years of experience. The Office of the United States Trustee has not filed any objection to the Settlement.

(e)  "The nature and breadth of releases to be obtained by officers and directors"; and "the extent to which the settlement is the product of arm's length bargaining".

**Response:**

The Debtor represents that neither Mr. Kleinhendler nor Mr. Fernandez have any interest in Pan American. The only releases being provided are from Pan American.

11.  Case law is abundant that the "lowest point in the range of reasonableness" does not mean that this Court must make an independent determination on the merits of the action before it can approve a settlement, nor does it mean that this court must conduct a mini trial of the alleged issues. Instead, a reviewing Court merely needs to have an understanding of the merits and deficiencies in the litigation and the uncertainty of the litigation. Here, Diatomite bases its entire argument on what it labels as "undisputed" facts and yet appears to acknowledge that a trial is warranted[6] and that it will take on the "laboring oar" (*see* p. 4, ¶ 8 to the Objection); and yet, on a parallel track, Diatomite fails to even minimally address any

---

[6] Diatomite alleges only that "[t]he Adversary Proceeding claims are likely to succeed" (*see* p. 21 to the Objection). "Likely" is interchangeable with "presumably" but a far cry from certainty.

progress (or the likelihood of success) in its aggressively pursued malpractice action (with regard to which any amounts recovered by Diatomite would result in a corresponding reduction of its claim against the Debtor).

12. Notwithstanding, case law is clear that a court may approve a settlement even if it believes that the trustee or debtor-in-possession ultimately would be successful at trial. *In re Teltronics Services, Inc.*, 46 B.R. 426 (E.D.N.Y. 1984), aff'd, 762 F.2d 185 (2d Cir. 1985), and correspondingly, "the law favors compromise." *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976). In addition Diatomite seems to intentionally swerve around (with a proverbial blind eye) a significant deficiency in its complaint by having alleged that Mr Applestein may not have been cognizant of the initial sale transaction he signed with the Debtor. If so, then an associated issue arises as to whether Mr. Applestein was (or more likely was not) cognizant of his daughter suddenly and subsequently taking over his personal affairs without a court order of any kind.[7] This raises the issue (known to Diatomite) of whether or not Diatomite had valid client authority to commence the actions in the first place and whether or not the daughter had authority to make decisions on her father's behalf. In fact it is entirely unclear as to who hired the Venable firm to bring these actions and/or to appear in Bankruptcy Court and/or to appear in State Court on behalf of Diatomite. The disputes and uncertainties to the Diatomite action abound.

---

[7] Almost reminiscent of the time when President Reagan was shot and Al Haig went in front of the cameras and declared without any constitutional authority to do so…"I'm in control here and not to worry."

13. Accordingly, it is respectfully requested that the Court grant the Motion in its entirety along with such other and further relief as may be just and proper.

Dated: New York, New York
       August 10, 2021

                              PICK & ZABICKI LLP
                              Counsel to the Debtor

                     By: _____
                              Douglas J. Pick, Esq.
                              369 Lexington Avenue, 12th Floor
                              New York, New York 10017
                              (212) 695-6000