# Exhibit "B"

1

1   UNCERTIFIED TRANSCRIPT DISCLAIMER IN THE MATTER OF:

2   Applestein v. Kleinhendler

3   2/16/21

4        The following transcript of proceedings,
    or any portion thereof, in the above-entitled
5   matter, taken on any date, is being delivered
    UNEDITED and UNCERTIFIED by the official court
6   reporter.

7        The purchaser agrees not to disclose this
    uncertified and unedited transcript in any form
8   (written or electronic) to anyone who has no
    connection to this case.  This is an unofficial
9   transcript, which should NOT be relied upon for
    purposes or verbatim citation of testimony.
10
        This transcript has not been checked,
11  proofread or corrected.  It is a draft transcript,
    not a certified transcript.  As such, it may contain
12  computer-generated mistranslation of stenotype code
    or electronic transmission errors, resulting in
13  inaccurate or nonsensical word combinations, or
    untranslated stenotype symbols which cannot be
14  deciphered by non-stenotypists.  Corrections will be
    made in the preparation of the certified transcript,
15  resulting in differences in content, page and line
    numbers, punctuation and formatting.
16
        This realtime uncertified and unedited
17  transcript contains no appearance page, certificate
    page, index or certification.
18

19

20

21

22

23

24

25

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

♠   2

1        THE COURT REPORTER:  Raise your right hand,

2    please.

3        Do you swear that the testimony you're

4    about to give will be the truth, the whole

5    truth, and nothing but the truth?

6        THE WITNESS:  I do.  Yes.

7    Thereupon:

8            ANDREA BIVENS, DVM,

9    having been first duly sworn, was examined and

10   testified as follows:

11           DIRECT EXAMINATION

12   BY MR. CIARDI:

13       Q.  Ms. Bivens, my name is Albert Ciardi.  I

14   represent the defendants.

15      Have you ever been deposed before --

16  putting aside remotely, but have you ever been

17  deposed before?

18  A.  No.

19  Q.  Okay.  So I'm going to ask you a series of

20  questions, I'm going to need you to answer them.  If

21  you don't understand my question at any point in

22  time, please stop and ask me to rephrase, break it

23  up, whatever makes it so that you can understand my

24  question.

25      If you answer my question, I'm going to

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

3

1  assume that you understood it and are answering to

2  the best of your ability.  Okay?

3  A.  Yes.

4  Q.  One of the other things, obviously all your

5  answers have to be verbal, and they need to be more

6  than just some sort of a nod or a, you know, an

7  uh-huh or something like that.

8      To the extent there's an exhibit, I think

 9  they've gone over Exhibit Share with you.  I will

10  put the exhibit into the -- on to the screen.  It'll

11  show up on your other screen or however you're

12  seeing the exhibits.  You'll be able to freely move

13  through it as I do, but I may point you to certain

14  parts.  If at any point in time you have a question

15  or you can't get to it read it, see it, just let us

16  know so that we can take a break and work through

17  that.  Okay?

18      A.  Yes.

19      Q.  If you -- I'm going to do my best to not

20  speak over you.  If you don't interrupt me, we should

21  get a good record.  Your lawyer may have, at points

22  in time, make objections.  Do not answer.  Just wait

23  until he either says, "You can answer" or "We move on

24  past that," but wait before you answer for one of us

25  to tell you what you should or shouldn't do at that

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

♠  4

 1  point if there's an objection.  Okay?

 2      A.  Okay.

3    Q.  Okay.

4        Are you under or have you taken any

5    medication today or have any other issues that would

6    prevent you from being able to testify truthfully or

7    accurately?

8    A.  No.

9    Q.  Okay.

10       All right.  So you -- do you -- do you

11   know why you are here today?

12   A.  Yes.

13   Q.  Okay.  Why do you think you are here today?

14   A.  I am here for you to get my answers to your

15   questions about what happened between Howard

16   Kleinhendler and my father.

17   Q.  Okay.  Did you receive a notice of

18   deposition?

19   A.  I did.

20   Q.  Okay.  And did you -- did you review it

21   when you received it?

22   A.  I did.

23   Q.  Okay.

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

1    Is it your position, and I'm not asking you as a

2    doctor, I'm asking you as a daughter, that your

3    father was incapable of making decisions in 2017 to

4    manage his affairs?

5        A.   In 2017, yes.

6        Q.   Okay.

7        A.   I am a veterinarian, I'm not a physician,

8    just so you know.  So you don't have to preface that.

9    I don't actually treat people.

10        Q.   No, no, no, I ask you with that because

11    it's -- I'm not asking for your expert opinion,

12    Andrea.  I'm asking for what you observed?

13        A.   Right.  I'm saying, my opinion, if it came

14    to human health, would not be expert regardless if I

15    --

16        MR. VIDAL:  I think he's more worried about

17    me objecting to --

18        MR. CIARDI:  I'm worried about Tom

19    objecting.  We're not in the same room so I'm

20    not worried about you hitting me, Andrea.  I'm

21    just worried about Tom objecting.

22        Okay.  I'm going to try and mark an

23    exhibit.  See if this works.  Exhibit number --

24    this will be Exhibit 15.

25        We are out of order.

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

⬆ 38

1        What am I using?  Defendant, right?  I

2    think that's what I used.

3        MR. VIDAL:  Is this Exhibit 15 carrying on

4    from --

5        MR. CIARDI:  No, I'm going to put the name

6    on this one, Biven, if I get it right.

7        If I use a separate color, does it matter,

8    Tom?

9        MR. VIDAL:  I don't think it matters.

10        MR. CIARDI:  Okay.

11    BY MR. CIARDI:

12    Q.  Okay.  Andrea, you may have to refresh your

13    screen, at least that's what we learned last time in

14  order to view the exhibit.

15      MR. VIDAL:  It just came up for me.

16    A.  Okay, and there's a PDF.

17  BY MR. CIARDI:

18    Q.  It's a three-page document.

19    A.  Okay.

20    Q.  I'm going to ask you.

21    A.  I have to cover up your face to do it.

22    Q.  Okay.  My face is not that important in

23  this deposition.  So if you-- take whatever time.

24  All I want you to do right now is just look at it

25  briefly and when you've done that, let me know and

         ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

↟  39

1  I'll have some questions.

2    A.  It's so little.  Maybe this preceded that

3  phone call, that second phone call, that I didn't

4  know the date.

5    Q.  Okay.

6    A.  Because -- hang on a second, I have seen

7  that.

8       Am I supposed to wait for you to ask me a

9   question?

10      MR. VIDAL:  Your lawyer usually likes it

11      better when counsel asks a question first.

12      MR. CIARDI:  And Tom, would appreciate it

13      best.  But I mean --

14   BY MR. CIARDI:

15      Q.  Andrea, my first question is very simple:

16   Have you seen this before?

17      A.  I have.  I want to still read it again,

18   hang on a second, though.

19      Q.  Okay.

20      A.  No, I did see that, and that's after that

21   conversation -- okay, you can ask me questions.

22   Wait, I want to see you.  Okay.

23      Q.  It's a two-page document.  Ignoring the

24   cover page, of course.

25      A.  Then, no, I got a cover page and then one

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

1   handwritten page.  Did I miss something?

2    Q.  There should be an intermediate email.

3    A.  I have a blank page and then I have a page

4    that says, like, Andrea, blah, blah, blah, Betz, and

5    then a handwritten page that's the agreement.

6    Q.  Right.  Three pages.

7    A.  And one of them is blank?

8    Q.  Yes, the first page is blank.

9    A.  I'm sorry?

10    Q.  The first page should be blank and it's got

11    a sticker at the top, right corner?

12    A.  I got that.

13    Q.  Okay.  All right.

14        The second page, this is what appears to

15    be an email that was sent in July of 2016 regarding

16    the notes that were presented earlier.  Do you see

17    that?

18    A.  Yes, sorry.

19    Q.  Why did you -- do you know why you were

20    sent this by Betz?  And I'm not asking you to look

21    into her mind -- I'm just saying, did she express to

22    you, "I'm sending this to you."  Did you ask for

(40 cont)

23   updates? How did this get to you?

24      A.  I would have to take my best guess, like,

25   based on the circumstances then which is, there was

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

41

1   that other conversation where he had said we were

2   going to get those empty shares and I was not happy

3   about it.  So I think this -- my guess is this was

4   that answer where it says, "No, we're getting a

5   lien," and he had said something about, there was

6   some kind of thing that Howard had said that, "Well,

7   we won't sell off the golf course and we'll hang on

8   to some of the property for you to have, like the" --

9   we had some real estate, we had a -- like a -- like a

10  mortgage, you know.

11       So I think this was her presenting me with

12  their answer to my concerns.

13      Q.  Okay.

14      A.  That is my best guess.

15      Q.  All right.  So when you got this, what did

16  you do with it, if anything?

17    A.  I don't think I did anything with it.

18    Q.  Okay.  Did you --

19    A.  It wasn't a question, was it?  This is what

20  your father has agreed to.

21    Q.  Okay.  When you got this email and these

22  terms, did you -- did you speak to your father about

23  it at all?

24    A.  I cannot speak to my father because he

25  doesn't want to speak.

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

↑  42

1    Q.  Okay.  So the only way to communicate with

2  your father then would have been in person or by

3  email or in person?

4    A.  I wish we could video, like, my father so

5  that you -- or even back then that you would have an

6  understanding of -- you talk to my father, he just

7  looks at you like this and then just walks out of the

8  room.  I don't --

9        So I'm pretty sure I did nothing about it.

10  It sounded like a done deal.  And as long as there

11  was a lien on the property, I don't think that I had

12  an objection to there being a lien on the property

13  in my father's favor as long as my father was

14  protected.

15      Q.  Okay.  Did you reach out to Mr. Dohan about

16  this?

17      A.  No.  I was not running the show at that

18  point.  Dohan and Betz and Howard I think were

19  communicating.  Betz was doing, like, the paperworky

20  stuff, Steve was doing the accounting stuff, and

21  Howard was doing the business deal stuff.

22      Q.  Okay.

23          Did you raise any concerns with either of

24  them when you got this that you didn't think your

25  father could -- would understand what he was

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

1  agreeing to?

2      A.  No.  The -- I agreed -- I think that the

3  property -- if it were up to me.  I've been careful

4  about not standing in the way of the sale of the

5 property because I would have never wanted -- I think

6 a thousand acres of anything should stay native. I

7 know my father wanted to sell the property. If he

8 had a secure lien on the property, then I felt like I

9 should shut up and let him sell his property because

10 it was not my property, and that my natural

11 tree-hugger instincts should shut up and mind its own

12 business.

13        But I -- "AA retained liens on the shares

14 and will not sell the golf course land without his

15 consent or by paying off the 7 million."

16        So it sounded to me like if that is --

17 unless that's not saying a lien.

18        I don't -- I don't honestly know it at

19 what point.

20    Q.  Let me rephrase it. Did you have --

21    A.  He --

22    Q.  I think you've answered the question,

23 Andrea. And if you want to keep talking you can, but

24 I think Tom's going to have a problem with this.

25    A.  I have seen it. I don't . . .

        ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

1    Q.  Okay.  Assuming you didn't have any

2  conversations with Steve about it, did you and Betz

3  have any conversations between --

4    A.  I don't recall.

5    Q.    -- her giving you this and the closing or

6  that call before the closing?

7    A.  I do not recall.  I'm sure I had

8  conversations with her between July 2016 and

9  April 2017.  Is that the question?

10    Q.  Let's -- why don't -- let me rephrase the

11  question.  Between this email and that phone call

12  before the closing, did you have any other calls with

13  Betz regarding the Fones Cliffs property?  Let's just

14  limit it to that topic.

15    A.  I don't honestly recall.  This was not

16  something that -- outside of those few conversations,

17  I had very little to do with this until this

18  bankruptcy happened.

19    Q.  Okay.

20    A.  This was not -- my father's affairs were

21  not a day-to-day Andrea part of life until now.  So

22  it was not my thing.

23      Q.  Okay.  And until then it became your thing

24  in 2018, who did you think was managing his life, or

25  who do you think was doing what you're doing now?

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

↑  45

1      A.  I thought that I got very lucky in that my

2  father hired people who, for whatever reason, had

3  this undying loyalty to him and changed their lives

4  to meet his needs.  I thought that Betz

5  metamorphosized herself from administrative assistant

6  to a life manager, and that Boony turned himself from

7  a housekeeper into a CNA, and Antonio from a driver.

8  And I told anyone who asked, "I was the luckiest

9  person in the world that my father, who lives in what

10  was supposed to be this snobby, condo thing in

11  Aventura, turned his life into this assisted living

12  facility and everything worked out."  Yep.  That is

13  exactly what it was and that is exactly what it has

14  been, and it is exactly what it is still.

15    Q.  And during this period of time -- and what

16  did you understand Mr. Dohan's role to be as it

17  relates to your father's business interest?

18    A.  He is an overpaid accountant.  Still today.

19  He is still an overpaid accountant.

20    Q.  Okay.  All right.  So now I'm going to

21  close out of this exhibit.

22    A.  Am I allowed to ask you a question during a

23  deposition?

24    Q.  It depends on what it is.  Not really, but

25  I will let Tom decide that.  If -- you can ask a

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

♠ 46

1  question.  I don't know if I'll be able to help you,

2  though, with it, Andrea.

3    A.  Okay.  Because I am kind of curious with

4  this Exhibit 15.  Do you know the date of the phone

5  call that I don't know the date of?

6    Q.  I don't know that we do know that.

7      MR. CIARDI:  Tom, do we?

8      MR. VIDAL:  I think that's the correct

9    answer.  I don't know exactly --

10  BY MR. CIARDI:

11    Q.  Andrea, I am not -- and let me correct

12  that.  This isn't a memory game.  I'm not going to

13  ask you -- I'm not -- this isn't like -- I'm not

14  trying to play gotcha here.  When we get to court,

15  another story, but --

16    A.  I'm not asking for a spot --

17    Q.  I am looking for information now, and if

18  you know it, you don't know it, I will try to give

19  you dates.  I just don't know the date of that call.

20    A.  I'm not asking because of that.  I'm asking

21  because I'm not sure if this is what generated the

22  phone call or if . . . You know what I mean?  Like I

23  don't -- I would be interested if I -- you know, I

24  had like a magic crystal ball that I could see where

25  are those two -- which came first, the call or the --

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

1  but I don't remember, so . . .

2    Q.  Unfortunately, I don't think any of us know

3  that information.

4      A.  I thought maybe you did.

5      Q.  No.  So I have just introduced another

6  exhibit.  This is Exhibit 6.

7          (Thereupon, marked as Exhibit      .)

8  BY MR. CIARDI:

9      Q.  And if you could just take a look at it.

10  It's, again, a two-page document with one of them

11  being a cover page.

12          MR. VIDAL:  This came across to me.  I got

13      it.

14  BY MR. CIARDI:

15      Q.  You may have to refresh, Andrea, if it's

16  not coming through.

17      A.  I did.  Okay.

18      Q.  Okay.  Do you remember or do you have any

19  recollection of your father resigning from something

20  and you accepting being the successor of something?

21      A.  Yeah, we had to sign those resignations and

22  everything in order to hire Venable.

23      Q.  Okay.  When -- were you present when your

24  father signed his resignation?

25     A.  No.

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

1     Q.  Do you know who was present?

2     A.  Probably Betz.

3     Q.  Okay.  In -- this looks like this occurred

4  in 2019.  Did your father know what he was signing?

5  And again, not looking for your medical opinion, but,

6  again, as his daughter, I think you've expressed that

7  you didn't think he was able to do certain things in

8  the past.  I'm wondering in 2019, if you thought he

9  knew what he was signing?

10     A.  I think we were late in getting him to sign

11  it.

12     Q.  So you -- you do not think you knew what he

13  was signing?

14     A.  I don't know if he knew what he was

15  signing.

16     Q.  Did you express any of those concerns to

17  Marian Hasty at that point in time, that your father

18   may not know what he is signing or doing?

19      A.  No, I did not.

20         So I am going to ask you another question.

21   Even though I'm not allowed to ask you questions.

22   But if this is the avenue that you heading down,

23   you're going to be feeding my father to the wolves

24   if this is what you're going after is the people

25   that are protecting my father, then you're handing

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

49



1   him over to the maniac who is being sued by the

2   federal government and this -- this is not a good

3   way to -- this is -- this is not the moral path that

4   you should be on.

5      Q.  Andrea, I have no idea what -- who you're

6   referring to.

7      A.  You know who I'm referring.  You do know

8   who I'm referring to.  And this -- this is -- this

9   is -- this -- this was us -- the only way that we

10   could go and protect my father's interest and hire a

11   lawyer because I cannot hire a lawyer because my

12  father could not speak, is to -- the only way I could

13  execute the documents that my father was told by his

14  psychiatrist, that he had drawn up, that I hadn't

15  gone and pushed for earlier, is that we finally went

16  ahead and executed that --

17      Q.  If you're done your answer, I'm going to

18  suggest that we take a three-minute break.

19          MR. CIARDI:  And, Tom, you and Andrea may

20      need to chat.

21          MR. VIDAL:  Yes.  Thank you very much.

22          MR. CIARDI:  Let's go off the record, if

23      you don't mind for like five minutes, Tom.  Is

24      that enough?

25          MR. VIDAL:  That's fine.  Going off the

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

50

1   video now.

2   (Recess was held from 3:09 a.m. until 3:12 a.m.)

3   BY MR. CIARDI:

4       Q.  Andrea, we're back on the record.

5           If you would take a look at Defendant's

6    Exhibit 7 which should now be up on the screen.

7           And after you have had a chance to look at

8    it let me know when we can discuss it.

9       A.  Okay.

10      Q.  Exhibit 7 is one email dated July 3rd of

11   2019, another dated March 25th and a third dated

12   March 25th as well.

13          Do you see those three emails?

14      A.  Yes.

15      Q.  Starting with the one at the end,

16   March 25th, can you tell me what the purpose of the

17   resignation and the acceptance was -- and, again, I'm

18   not looking for you to give me a legal opinion, but

19   what you anticipated was happening as -- in whatever

20   role you were accepting in this transaction?

21      A.   I was accepting the trusteeship for -- of

22   my father.  This is for his personal trust.  There

23   was a couple things going on right then, one was

24   power of attorney.  The other is, all of his accounts

25   at Northern Trust were receiving no interest

                ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

1  whatsoever, and we were moving them to Centennial,

2  and we couldn't do that without a resignation of

3  trustee.  So it was for those two reasons:  Changing

4  the banks and the attorneys wanted them.

5     Q.  Okay.  The email right before that is

6  another March 25th one from Marian Hasty to you and

7  Mr. Dohan.  Which has a series of attachments which

8  are not attached.  Okay?

9     A.  Okay.

10     Q.  What was the -- what generated Marian Hasty

11  sending this email?  What caused that to happen?

12     A.  I think it was in response to when I

13  started hiring the attorneys my father became time

14  consuming whereas before, like I told you, I didn't

15  spend a lot of daddy time, it wasn't a big part of my

16  life.  And I've asked her, I said, "I understand I'm

17  the healthcare surrogate, but given the fact that I

18  seem to be disowned, can you tell me if I'm still

19  disowned because this is taking a lot of my time."

20        And so I asked her where -- "What is the

21  situation?"  Because I had never seen the estate

22  planning documents other than what I was sent to me

23  was the part that was important that I know which

24  was I had to be shown the healthcare surrogate

25  because for the feeding tube.  I had to allow a

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

♠  52

1  feeding tube, but I had never seen whether or not I

2  remained disowned.

3        And I thought, you know, I'm doing this

4  stuff because it's the right thing to do.  But if I

5  have been disowned, it's taking a lot of time.  So I

6  asked her what is the thing, are my sisters and I

7  still disowned?

8     Q.  Okay.  And so that was the response to

9  this?  These two emails seemed to have worked

10  together.  One is giving you the information and the

11  other is the resignation.

12        Would that be correct?

13    A.  No.  They -- all of this stuff happened --

14  the resignation was part of the stuff that was time

15  consuming that would have generated the question

16  like -- if you knew the number of hours I'm spending

17  on this, it, you know -- it's a lot of time I'm

18  spending on it for -- so I asked that question.

19     Q.  Okay.

20     A.  The resignation wasn't -- it's not -- it's

21  the opposite order of what I think you probably

22  think.  The resignation was part of all this time

23  consuming stuff, changing the banks, changing the

24  lawyers, doing all this stuff to try to get my dad's

25  messes cleaned up.  And then I asked the question,

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

♠  53

1  like, you know, what is going on with all of his

2  estate stuff.

3     Q.  Okay.  So when -- were you -- you were not

4  present when your father signed the document.  I

5  think we already discussed that, correct?  Or you

6  were?

7     A.  No, it's not, but I actually have a video I

8  think if I dug through my email.  I think she videoed

9  it and I think she actually asked him a question:

10    "Do you understand what you're signing?" And I think

11    she was there, and I think -- I have to look for it,

12    but I am 95 percent certain that there is a video of

13    him signing that resignation of trustee.

14    Q.  Okay.

15        MR. CIARDI:  Tom, I don't think we have it,

16    so . . .

17        MR. VIDAL:  I have not seen it either.

18        THE WITNESS:  Well, it wasn't something you

19    asked for.  You asked for medical stuff and

20    stuff relevant to Virginia.

21        MR. CIARDI:  We'll let Tom deal with that

22    with you, Andrea.  I'm not fighting with you,

23    I'm just saying I haven't seen it.

24        MR. VIDAL:  I think it's fine.  If it

25    exists, then I think we should --

        ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

▲  54


1        THE WITNESS:  I will -- when we finish --

2    you don't want me to look for it now?

3        MR. CIARDI:  No, I don't want you to look

4    for it now.

5         THE WITNESS:  I will find for you later and

6    send it to Tom.  Is that what you want me to do?

7         MR. CIARDI:  Yes.  If you could do that,

8    that would be great.

9  BY MR. CIARDI:

10    Q.  Okay.  Why, again, is there a separate

11  email in July with -- with other changes and a

12  different resignation with regard to the trust?

13    A.  Because we didn't understand when we did

14  it -- they made us do, like okay, for this account --

15  we did not get -- or at least I did not get -- we had

16  to do, like, the resignation of trust for DCA grantor

17  trust, we had to do a resignation of trust for the

18  AHA trust.  We had to do a thing for a -- there were

19  a whole bunch of different resignations for

20  different -- and we didn't realize it, and so they

21  all got -- they didn't all get done at the same time,

22  they got done like, you know, we went to close this

23  account and move it to this bank.  And then we went

24  to close this account, and they were, like, "You

25  don't have the resignation."

ROUGH DRAFT - NOT A CERTIFIED TRANSCRIPT

⬆ 55

1          We were like, "We just did that," and it

2  was a different form for that account.

3      Q.  Okay.  When they were signed, the only

4  person there would have been Betz, would that be

5  accurate, Andrea?

6          Either Betz, Boony or Antonio?

7      A.  When they were signed by my father?

8      Q.  Father, yes.

9      A.  Yes.

10      Q.  Okay.

11      A.  Because it would have been in Miami.  We

12  wouldn't have moved him.

13      Q.  And I don't think this matters to the case

14  now, but is he still at his residence in Aventura?

15      A.  Uh-huh.

16      Q.  Okay.  All right.

17          That's it for that one.

18      A.  Sorry.  That should have been a yes.