EXHIBIT "B"

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "<u>Agreement</u>") is entered into as of the 24ᵗʰ day of March, 2022, by and between Virginia True Corporation, a Virginia corporation ("<u>Seller</u>"), and Fones Cliffs Development LLC, a Delaware Limited Liability Corporation ("<u>Purchaser</u>"). Seller and Purchaser are sometimes referred to in this Agreement each individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

### W I T N E S S E T H :

WHEREAS, on May 3, 2019 (the "<u>Petition Date</u>"), Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §101 *et seq*. (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Eastern District of New York (the "<u>Bankruptcy Court</u>"), commencing Case No. 19-42769 (NHL) (the "<u>Chapter 11 Case</u>"); and

WHEREAS, Seller will file a motion seeking, *inter alia*, approval of the sale (the "<u>Sale</u>") of the real property more particularly described in Section 1.1 hereof to the successful bidder (the "<u>Successful Bidder</u>") as determined by the bidding procedures established by the Bankruptcy Court (the "<u>Bidding Procedures</u>") at an auction ("<u>Auction</u>"), the Order sought by the Seller being the "<u>Bidding Procedures Order</u>"; and

WHEREAS, subject to the terms and conditions of this Agreement, the Bidding Procedures Order, the results of the Auction and upon the Final Order (defined below), Seller wishes to sell to Purchaser and Purchaser wishes to acquire from Seller the Property; and

WHEREAS, the transactions contemplated by this Agreement will be consummated pursuant to an Order of the Bankruptcy Court, approving, *inter alia*, the sale of the Property (the "<u>Sale Order</u>"), consistent with terms, conditions and transactions contemplated by the Agreement; and

NOW, THEREFORE, in consideration of the promises and of the mutual covenants, agreements, representations and warranties herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

<u>Article 1</u>.  <u>Property</u>.

1.1    <u>Property</u>. Seller shall sell and convey to Purchaser, and Purchaser shall purchase from Seller, upon the terms, covenants and conditions hereinafter set forth: (a) all of Seller's right, title and interest in and to the 964 acres of land designated as Tax Parcels 4-1, 4-2 and 5-30 on the Richmond County, Virginia Tax Map, and as more particularly described in **Schedule "A"** hereto (together, the "<u>Land</u>"), (b) together with all buildings and improvements situated on the Land; (c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for

any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway; (d) the appurtenances and all the estate and rights of Seller in and to the Land; (e) all right, title and interest of Seller, if any, in and to the fixtures, equipment and other personal property attached or appurtenant to the Land, all in their then existing condition and state of repair as of the Closing Date; (f) all development rights attached to or appurtenant to the Property (collectively, "Property").

Article 2.  Purchase Price; Acceptable Funds.

2.1    Subject to higher and better offers at the Auction, the purchase price for the Property is $4,200,000.00 (the "Purchase Price"), payable by Purchaser as follows:

(a)    $210,000.00 by cashier's check or attorney escrow check payable to the order of Pick & Zabicki, LLP ("Escrow Agent"), or by wire transfer to a non-interest bearing account designated by Escrow Agent, the receipt of which is hereby acknowledged by Seller, as a downpayment toward the Purchase Price (the "Downpayment"), which Downpayment shall be deemed to have been made for the account of Seller and held and disbursed by Escrow Agent pursuant to the further terms and conditions of this Agreement; and

(b)    The balance of the Purchase Price, in an amount equal to the difference between the Purchase Price and the Downpayment, subject to adjustment as provided for herein (the "Balance") on the Closing Date (as hereinafter defined), by wire transfer, bank check or attorney escrow check of immediately available Federal funds to an account or accounts designated by Seller.

Article 3.  Closing.

3.1    (a)    The closing of title to the Property (the "Closing") shall take place at the offices of Seller's counsel, Pick & Zabicki LLP, 369 Lexington Ave Suite 1200, New York, NY 10017, within fifteen (15) business days after entry of the Sale Order by the Bankruptcy Court and said order being final and unappealable or such other date and place as Purchaser and Seller may mutually determine in writing (the "Closing Date").

3.2    This shall be an "all or nothing" Agreement, and Seller shall be obligated to sell the three (3) tax parcels (Tax Parcels 4-1, 4-2 and 5-30) constituting the Property to Purchaser, and Purchaser shall be obligated to purchase the three (3) tax parcels constituting the Property from Seller, subject to the terms and conditions of this Agreement.  In the event that Seller shall fail to sell the three parcels, Seller shall be in default of this Agreement, subject to the further terms and conditions hereof.  In the event that Purchaser shall fail to purchase the three tax parcels, Purchaser shall be in default of this Agreement, subject to the terms and conditions hereof. Additionally, the obligation on the part of Seller and Purchaser to close hereunder is expressly conditioned upon Seller and Purchaser closing the sale and the purchase of the three tax parcels simultaneously.

Article 4.  Permitted Exceptions.

4.1     The Property shall be sold and conveyed, and Purchaser shall accept title to the Property, subject to the following matters (collectively, the "Permitted Exceptions"):

(a)     All covenants, easements, reservations, restrictions and agreements of record affecting the Property, provided same do not render title to the Property uninsurable or unmarketable at regular rates without the payment of additional premiums;

(b)     Any and all present and future laws, regulations, restrictions, requirements, ordinances, resolutions and orders affecting the Property as of the date hereof, provided same do not render title to the Property uninsurable at regular rates without the payment of additional premiums;

(b)     Minor encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Property over any street or highway or over any adjoining property and minor encroachments of similar elements projecting from adjoining property over the Property, provided same do not render title to the Property uninsurable or unmarketable at regular rates without the payment of additional premiums or otherwise prohibit the redevelopment of the Property;

(c)     Any state of facts or physical condition which a current accurate survey or physical inspection of the Property would disclose, provided same does not render title to the Property uninsurable at regular rates without the payment of additional premiums;

(d)     All notices and all violations, if any;

(e)     Unpaid installments of assessments not due and payable on or before the Closing Date;

(f)     Financing statements, chattel mortgages and liens on personalty filed more than 5 years prior to the Closing Date and not renewed, or filed against property or equipment no longer located on the Property;

(g)     Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Property, provided same do not render title to the Property uninsurable at regular rates without the payment of an additional premium; and

(h)     The standard printed exceptions appearing on the title insurance commitment issued by the Title Company.

4.2     The Permitted Exceptions shall not constitute grounds for objection by Purchaser, and Seller shall have no obligation to remove any Permitted Exception as a condition to Purchaser's obligation to purchase the Property in accordance with this Agreement, except as otherwise expressly set forth in this Agreement.

3

Article 5.  State of Title; Objections.

5.1     Purchaser, at Purchaser's sole cost and expense, shall order a title report for the Property from any reputable title company licensed to conduct business in the Commonwealth of Virginia (the "Title Company"), within thirty (30) days after the date of this Agreement.  The Title Company shall be given instructions to provide a copy of the title report, and all searches made in connection therewith, to the attorney for Seller.  A copy of the title report delivered to Seller's attorney shall constitute Purchaser's notice of title defects with respect to the matters set forth therein which are not Permitted Exceptions and which in fact and in law render title to the Property uninsurable in accordance with the terms and conditions of this Agreement ("Objections").

5.2     If Seller either is unable to convey title to the Property in accordance with the provisions of this Agreement, or does not elect to remedy any Objection(s), Seller shall promptly so notify Purchaser in writing, and either: (a) Purchaser shall have the right to elect to accept such title as Seller is able to convey, without any reduction of the Purchase Price or any other credit or abatement on account thereof, or (b) to Purchaser may terminate this Agreement and entitling Purchaser to receive a refund of the Downpayment (without seeking damages).  Purchaser shall make its election by written notice to Seller given not later than the tenth (10th) business day after Seller gives written notice to Purchaser of its inability or unwillingness to remove any Objection(s).  Notwithstanding the foregoing provisions of this Article 5, all: (i) tax and/or state and/or federal court judgment liens encumbering the Property (including the preparation or filing of appropriate satisfaction instruments in connection therewith);; and (ii) Voluntary Liens (as hereinafter defined) shall be satisfied or discharged by Seller on or prior to the Closing Date, or, in the alternative, Seller shall deposit in escrow with the Title Company at Closing an amount reasonably determined by the Title Company to be necessary for Seller to satisfy such matters post-closing.  The term "Voluntary Liens" as used herein, shall mean liens and other encumbrances which Seller has knowingly and intentionally placed on the Property, or with respect to which Seller has taken an affirmative action that directly results in the placement of same against the Property, including, without limitation, any and all: (i) mechanics' liens relating to work performed or alleged to be performed at the Property and (ii) mortgages recorded for money borrowed by Seller.

5.3     Notwithstanding anything to the contrary contained herein, Seller shall have the obligation to use Seller's commercially reasonable efforts to remedy any and all Objections prior to the Closing Date (the Objections which Seller is obligated to satisfy or discharge pursuant to Section 5.2).  In the event Seller shall be unable (as opposed to unwilling) to remedy such Objections prior to or on the Closing Date (other than Objections which Seller is obligated to satisfy or discharge pursuant to Section 5.2), Seller shall be entitled to one (1) or more adjournments of the Scheduled Closing Date for an aggregate period not to exceed sixty (60) days after the Scheduled Closing Date.  Purchaser's obligations under this Agreement shall remain in full force and effect during any such adjournment period.  If Seller fails to remedy any Objection(s) prior to the date which is sixty (60) days after the Scheduled Closing Date, then Purchaser may elect, in Purchaser sole and absolute discretion, to allow Seller an additional thirty (30) days to remedy the Objection(s) (the "Objection Extension Period"), in which event Seller shall use Seller's commercially reasonable efforts (and shall keep Purchaser apprised of Seller's progress) to remedy the Objection(s) prior to the expiration of the Objection Extension

Period.  If Purchaser does not grant the Objection Extension Period or, in the event that Seller is unable (as opposed to unwilling) to remedy the Objections prior to the termination of the Objection Extension Period (if so granted by Purchaser), Seller shall be deemed to have elected not to remedy any Objection(s), entitling the Purchaser to cancel the Contract and to receive a refund of the Downpayment (without seeking damages).

5.4    Notwithstanding anything to the contrary contained herein, and provided the amount required to remove any Objection(s) (the Objections which Seller is obligated to satisfy or discharge pursuant to Section 5.2) does not exceed the Purchase Price, at Closing, Seller, in Seller's discretion, shall be permitted to: (a) use any portion of the Balance to remove or discharge any Objection(s) or (b) deposit with the Title Company monies (which may include a portion of the Purchase Price) and/or documents sufficient to effect the issuance of title insurance in favor of Purchaser free of any Objection(s), or with affirmative insurance against the enforcement or collection of any such Objection(s) against the Property, and Purchaser shall accept title to the Property with such insurance and/or affirmative coverage.  If written request is made by Seller or Seller's attorneys not less than two (2) business days prior to the Closing, Purchaser shall, in accordance with the provisions of Article 2 hereof, deliver separate checks, or wire funds to separate accounts, aggregating the amount of the Balance, to facilitate the removal and discharge of any Objection(s) and the discharge of Seller's other monetary obligations under this Agreement or as otherwise required by Seller.

5.5    If any matter not revealed in the title report is added to the title report by the Title Company at or prior to Closing, Purchaser shall have until the earlier of (a) ten (10) days after the Purchaser's receipt of the updated, revised title report showing the new title exception, together with a legible copy of any such new matter, or (b) the date of Closing, to provide Seller with written notice of its objection to any such new title exception, in which event, such objection shall be governed by the terms and conditions of Sections 5.2, 5.3 and 5.4 hereinabove.

Article 6.  Responsibility for Violations.

6.1    Purchaser shall acquire the Property subject to all notes or notices of violations of law or municipal ordinances, orders or requirements noted in or issued by any governmental authority having jurisdiction thereof against or affecting the Property as of the date hereof and/or as of the Closing Date (the "Violations").  Purchaser shall accept title to the Property subject to any and all Violations, without abatement of the Purchase Price by reason thereof.  Purchaser acknowledges that Purchaser has heretofore examined the Property and the Violations in connection with the Purchaser's pre-contract due diligence and Purchaser agrees to accept the Property subject to all present and future Violations.

6.2    Except as otherwise set forth in Section 5.2 of this Agreement, Seller shall have no liability with respect to any Violations with respect to the Property.

**Article 7.**  **Condition of the Property; "As-Is".**

7.1      (a)      Except as expressly provided to the contrary herein, the Property shall be sold "as is", "where is", as of the date of this Agreement (use, wear and tear and natural deterioration excepted) with all faults, and without any warranties, express or implied, including but not limited to warranties of condition, fitness for a particular purpose or habitability.

7.2      Purchaser acknowledges that it has inspected the Property, is fully familiar with the physical condition and state of repair thereof, and all other matters relating to the Property, including: **(i) local issues in Virginia relating to possible attempts by local organizations to preserve artifacts that may be found on the  Property, (ii) that the Rappahannock Tribe, in connection with others, have been engaged in archeological exploration of an adjacent property to preserve artifacts and (iii) the proposed Consent Decree with the Department of Environmental Quality, and the State Water Board relating to the Property,** it being acknowledged by Purchaser that Purchaser has had a sufficient opportunity to perform all of Purchaser's due diligence with respect to the Property prior to the execution and delivery of this Agreement, and shall accept the Property "as is", "where is", as of the date of this Agreement, subject to  reasonable use, wear, tear and natural deterioration between now and the Closing Date, without any reduction or credit or abatement in the Purchase Price for any change in such condition by reason thereof subsequent to the date of this Agreement.

7.3      Purchaser hereby agrees to waive inspections, tests or assessments at the Property, including without limitation soil or foundation borings, test pits or groundwater sampling (collectively, the "Invasion Investigations").  Seller acknowledges and agrees that Seller has prior to the signing of the Agreement had access to the Property and has conducted and completed any and all Invasive Investigations, inspections, tests or assessments at the Property.  Notwithstanding the foregoing, in the event that Purchaser shall obtain financing in connection with the acquisition of the Property and Purchaser's lender shall require certain testing to be conducted upon the Property (whether or not such testing shall be deemed Invasion Testing), Purchaser, Purchaser's lender and any and all agents and/or employees thereof shall be permitted to access the Property for the purposes of conducting any such testing (collectively "Lender Investigations").  Purchaser acknowledges and agrees that, notwithstanding the outcome or conclusion of the Lender Investigations, Purchaser shall be required to acquire the Property and close on the sale of the Property subject to the terms and conditions of this Agreement.

7.4      Purchaser hereby releases Seller, Seller's partners, members, managers, affiliates, officers, employees, attorneys, accountants, agents and other representatives of Seller from any and all claims, demands, causes of action, judgments, losses, damages, liabilities, costs and expenses (including without limitation attorneys' fees whether suit is instituted or not), whether known or unknown, liquidated or contingent (collectively "Claims") asserted against or incurred by Purchaser (whether known or unknown, and whether contingent or liquidated) arising from or related to (a) any defects (whether construction, latent or patent defects), errors or omissions in the design or construction of the Property, whether the same are a result of negligence or otherwise; or (b) other conditions (including environmental conditions and physical conditions) affecting the Property, whether the same are a result of negligence or otherwise.   The release set forth in this Section specifically includes any Claims under any

6

Environmental Laws, under the American with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., or with respect to any environmental risk. "Environmental Laws" includes, but is not limited to, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§9601, the Emergency Planning and Community Right to Know Act (42 U.S.C. §§11001 et seq.), the Clean Air Act (42 U.S.C. §§7401 et seq.), the Clean Water Act 33 U.S.C. §§1251 et seq.), the Toxic Substances Control Act (15 U.S.C. §§2601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. §§1801 et seq.), the Occupational Safety and Health Act (29 U.S.C. §§651 et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §§136 et seq.), and the Safe Drinking Water Act (42 U.S.C. §§300f et seq.), as any of the same may be amended from time to time, and any state or local law dealing with environmental matters, and any regulations, orders, rules, procedures, guidelines and the like promulgated in connection therewith, regardless of whether the same are in existence on the date of this Agreement. Purchaser shall take title to the Property subject to any and all environmental conditions thereat (or the presence of any matter or substance relating to any such environmental condition at the Property), whether known or unknown, disclosed or undisclosed, including, without limitation, any and all claims and/or liabilities relating to (in any manner whatsoever) any hazardous, toxic or dangerous materials or substances located in, at, about or under the Property, or for any and all claims or causes of action (actual or threatened) based upon, in connection with or arising out of Environmental Laws.

   7.5 Purchaser acknowledges and agrees that:(a) Purchaser has had the opportunity to inspect the Property and its operation, (b) if this transaction is consummated, Purchaser will be purchasing the Property pursuant to Purchaser's independent examination, study, inspection and knowledge of the Property, and (c) Purchaser is relying upon its own determination of the value and condition of the Property and not on any information provided or to be provided by Seller.

   <u>Article 8</u>. <u>Representations and Warranties of Seller</u>.

   8.1 Seller represents and warrants to Purchaser that the following are true and correct in all material respects as of the date hereof:

   (a) This Agreement constitutes, and each document and instrument to be executed and delivered by Seller hereunder (collectively, the "<u>Seller's Documents</u>"), when so executed and delivered, shall constitute, the legal, valid and binding obligations of Seller, enforceable in accordance with their respective terms, covenants and conditions.

   (b) Seller shall (i) cause any and all service, management, employment or other contract ("<u>Service Contracts</u>"), if any, to be terminated as of the Closing Date; and (ii) be responsible for any and all costs, fees and/or expenses associated with terminating the Service Contracts prior to Closing.

   (c) There are no employees currently employed by Seller at the Property who will remain employed following the Closing Date. There are no collective bargaining or union

agreements in effect with respect to the Property. Seller will not enter into any negotiations or execute any contract with a labor union between the date hereof and the Closing.

(d)    All bills and claims for labor performed and materials furnished relating to the Property made at the request of Seller, or its officers, agents or employees will be paid in full and/or resolved, in writing, by Seller on or before the Closing Date.

(e)    No person, firm or entity, except for the Purchaser, has any rights in, or rights to purchase or acquire all, or any part of the Property, including, without limitation, a right of first refusal or option to purchase with respect thereto.

(f)    Seller has not received written notice of any pending or threatened condemnation proceedings with respect to the Property.

(g)    Neither the entering into of this Agreement, nor the consummation of the transactions contemplated hereunder, will constitute a violation or breach by Seller of any contract, writ, order, judgment, or other instrument or agreement to which Seller is a party, or to which it is subject to by which any of its assets or properties may be affected, or of any judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, ordinance, rule or regulation of any governmental authority affecting Seller.

(h)    Seller: (a) is the sole owner of the Property; (b) is a duly organized corporation licensed and/or qualified to conduct business in the Commonwealth of Virginia; (c) has all requisite power and authority to enter into this Agreement subject to obtaining approval of the sale from the Bankruptcy Court; (d) has full power and authority to enter into and perform this Agreement and to enter into the documents to be executed and delivered in accordance with the terms hereof; and (e) has full power and authority to consummate the transactions as contemplated herein.

(i)    There are no tax certiorari proceedings pending with respect to the Property or any part thereof.

(j)    To the best of Seller's knowledge and belief, the Property complies with all governmental regulations regarding the presence and/or condition of Hazardous Materials. Seller has not received written notice from any governmental agency that the Property is in violation of any environmental laws. The term "Hazardous Material" means the collective meanings given to the terms "hazardous material", "hazardous substances" and "hazardous wastes" in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601 et seq., as amended, Resource Conservation and Recovery Act 42 U.S.C. Section 6901 et seq., as amended, Federal Water Pollution Control Act 33 U.S.C. Section 1251 et seq., and also shall include any meanings given to such terms in any similar federal, state or local statutes, ordinances, regulation or by-laws. Without limiting the generality of the foregoing, the term "Hazardous Material" shall include any substance known to be hazardous, such as hazardous waste, lead-based paint, asbestos, methane gas, radon gas, urea formaldehyde insulation, polychlorinated biphenyls ("PCBs"), toxic substances or other pollutants. Purchaser acknowledges that the Property may contain underground oil tanks.

8

(k)     The development rights and/or air rights for the Property have not been previously transferred or conveyed by Seller.

(l)     The Property are currently vacant and there are no claims pending or threatened by any third party claiming an ownership, possessory or leasehold interest therein.

(m)     Except for the Environmental Enforcement Action commenced by the Virginia Department of Environmental Quality (the "DEQ") there are no notices, claims, actions or proceedings (zoning or otherwise) including, without limitation, governmental investigations, pending, or to the best of Seller's knowledge, threatened, in connection with the Property.

(n)     Seller has never filed a condominium plan in connection with the Property

(o)     Seller is not a Prohibited Person (as defined below). None of Seller's investors, affiliates or other agents (if any), acting or benefiting in any capacity in connection with this Agreement is a Prohibited Person. The assets Seller will transfer to Purchaser under this Agreement are not the property of, and are not beneficially owned, directly or indirectly, by a Prohibited Person. The assets Seller will transfer to Purchaser under this Agreement are not the proceeds of specified unlawful activity as defined by 18 U.S.C. §1956(c)(7). For purposes hereof, a "Prohibited Person" means any of the following: (i) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "Executive Order"); (ii) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (iii) a person or entity that is named as a "specially designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") at its official website, http://www.treas.gov/offices/enforcement/ofac; (iv) a person or entity that is otherwise the target of any economic sanctions program currently administered by OFAC; or (v) a person or entity that is affiliated with any person or entity identified in any of clauses (i), (ii), (iii) and/or (iv) above.

(p)     Seller is not a "foreign person" as defined in the Code Withholding Section.

8.2     The representations, warranties and covenants of Seller set forth herein are a material inducement to Purchaser entering into this Agreement and Purchaser is relying on the truth and accuracy of same. The representations and warranties contained in Article 8 are true and accurate as of the date hereof, shall be deemed to be repeated at and as of the Closing Date and shall be true and accurate as of such date.

8.3     Purchaser acknowledges and agrees that Seller has not made, does not make and specifically negates and disclaims, any representations (other than as set forth in this Agreement), warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to:    (a) the value, nature, quality or condition of the Property,

including, without limitation, the water, soil and geology, (b) the actual or projected income to be derived from the Property, (c) the suitability of the Property for any and all activities and uses which Purchaser may conduct thereon, (d) the compliance of or by the Property or its operation with any laws, rules, ordinances or regulations of any applicable governmental authority or body, (e) the habitability, merchantability, marketability, profitability or fitness for a particular purpose of the Property, (f) the manner or quality of the construction or materials, if any, incorporated into the Property, (g) the manner, quality, state of repair or lack of repair of the Property, (h) the layout or square footage of the Property, (i) the quantity, quality or condition of the articles of personal property, fixed equipment or fixtures included in the transactions contemplated hereby, or (j) any other matter with respect to the Property. More specifically, Seller has not made, does not make and specifically disclaims, any representations (other than as set forth in this Agreement) regarding compliance with any environmental protection, pollution or land use laws, rules regulations, orders or requirements, including the existence in or on the Property of hazardous materials or substances. Purchaser accepts the Property and waives all objections or claims against Seller (including, but not limited to, any right or claim of contribution) arising from or related to the Property or to any hazardous materials on the Property. Purchaser further acknowledges and agrees that, subject to Seller's representations set forth in this Agreement, Purchaser is relying solely on its own investigation of the Property and not on any information provided or to be provided by Seller, Purchaser further acknowledges and agrees that any information provided or to be provided with respect to the Property was obtained from a variety of sources and that Seller has not made any independent investigation or verification of such information and makes no representations as to the accuracy or completeness of such information. Seller is not liable or bound in any manner by any verbal or written statements, representations (other than as set forth in this Agreement) or information pertaining to the Property, or the operation thereof furnished by any real estate broker, property manager, employee, partner, member, manager, shareholder, agent, attorney or other person representing or purporting to represent Seller, Purchaser further acknowledges and agrees that, to the maximum extent permitted by law, the sale of the property as provided for herein is made on an "as is" condition and basis with all faults. It is understood and agreed that the purchase price for the Property has been adjusted by prior negotiation to reflect that all of the Property is sold by Seller and purchased by Purchaser subject to the foregoing.

## Article 9. Representations and Warranties of Purchaser

9.1    Representations and Warranties. As an inducement to Seller to enter into this Agreement, Purchaser represents and warrants that:

(a)    Purchaser is a duly organized and validly existing under the laws of the State of Delaware, is in good standing, has the power and authority to enter into this Agreement and to consummate the transactions herein contemplated and the execution and delivery hereof and the performance by Purchaser of its obligations hereunder will not violate or constitute an event of default under the terms or provisions of any agreement, document or other instrument to which Purchaser is a party or by which it is bound;

(b)    The execution, delivery and performance of this Agreement by Purchaser and the consummation of the transactions contemplated hereby in the manner contemplated

10

herein will not violate any provision of law, statute, rule or regulation to which Purchaser is subject or violate any judgment, order, writ, injunction or decree of any court applicable to Purchaser,

(c)     No consent, authorization, license, permit, registration or approval of, or exemption or other action by, any governmental or public body, commission or authority is required in connection with the execution, delivery and performance by Purchaser of this Agreement; and

(d)     Purchaser's rights under this Agreement do not, and upon its acquisition by Purchaser, the Property shall not constitute "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA").  Purchaser is not a "governmental plan" within the meaning of ERISA and the execution of this Agreement, and the purchase of the Property by Purchaser is not subject to state statutes regulating investments of and fiduciary obligations with respect to governmental plans.

(e)     Purchaser is not a "foreign person," "foreign trust" or "foreign corporation" (as those terms are defined in the Internal Revenue Code of 1986, as amended, and related Income Tax Regulations).

(f)     Purchaser is not insolvent and no petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against Purchaser or, to Purchaser's knowledge, contemplated against Purchaser.

(g)     Purchaser has reviewed the OFAC (as herein below defined) website (http://www.treas.gov/offices/enforcement/ofac before making the following representations and covenants and the following statements are true and correct on the date hereof and will be true and correct at all times through and including the Date of Closing:

(i)     Neither Purchaser, nor any person or entity who owns any direct or indirect equity or other interest in or controls Purchaser is (A) identified on any Governmental List (as hereinafter defined), or otherwise qualifies as a Prohibited Person (as hereinafter defined) or (B) in violation of any applicable law, rule or regulation relating to anti-money laundering or anti-terrorism, including, without limitation, any applicable law, rule or regulation related to transacting business with Prohibited Persons or the requirements of any Anti-Monty Laundering Law ( as hereinafter defined) or any Anti-Terrorism Law (as hereinafter defined).

(ii)     No funds or assets directly or indirectly invested in Purchaser constitute the property of or are beneficially owned, directly or indirectly, by any person or entity which is (A) identified on any Governmental List, or otherwise qualifies as a Prohibited Person or (B) in violation of any applicable law, rule or regulation relating to anti-money laundering or anti-terrorism, including, without limitation, any applicable law, rule or regulation related to transacting business with Prohibited Persons or the requirements of any Anti-Money Laundering Law or Anti-Terrorism Law.

11

(iii)    Neither Purchaser nor, to the best of Purchaser's knowledge, are any of its direct or indirect general or limited partners, shareholders, members, or beneficial owners: (A) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, any crime which in the United States would be a predicate crime to money laundering, or a violation of any Anti-Money Laundering Laws or Anti-Terrorism; (B) has been assessed a civil or criminal penalty under any Anti-Money Laundering Laws or Anti-Terrorism Law; or (C) has had any of its funds seized or forfeited n any action under any Anti-Money Laundering Laws or Anti-Terrorism Law.

(iv)    As used herein, the term (A) "Anti-Money Laundering Law" shall mean all U.S. laws, regulations and sanctions, state and federal, criminal and civil, that (1) limit the use of, and/or seek the forfeiture of proceeds from illegal transactions; (2) limit commercial transactions with designated countries, or individuals believed to be terrorists, narcotics dealers, or otherwise engaged in activities contrary to the interests of the United States; or (3) require identification and documentation of the parties with whom a Financial Institution (as defined in the relevant statute) conducts business; (B) "Anti-Terrorism Law" shall mean all U.S. laws, regulations and sanctions, state and federal, criminal and civil, that are designed to disrupt the flow of funds to terrorist organizations including, without limitation, (1) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, Pub. Law No. 107-56, 115 Stat. 296 (2001); (2) the International Emergency Economic Powers Act, 50 U.S.C. §§1701 et. seq. (2003); (3) the Trading with the Enemy Act, 50 U.S.C. App. §§ 1 et. seq. (2003); and (4) other similar laws (whether currently enacted or promulgated from time to time); in each case, together with any executive orders, rules or regulations promulgated thereunder, including without limitation, temporary regulations, all as amended or otherwise modified from time to time; (C) "Governmental List" shall mean (1) the List of Specifically Designated Nationals and Blocked Persons promulgated by OFAC from time to time and (2) any other similar list (including, without limitation, any list of Prohibited Persons) promulgated by any governmental authority from time to time; and (D) "Prohibited Person" shall mean any of the following: (1) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (herein called the "Executive Order"); (2) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (3) a person or entity that is named as a "specifically designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control (herein called "OFAC") at its official website, http://www.treas.gov/offices/enforecement/ofac; (4) a person or entity that is otherwise the target of any economic sanctions program currently administered by OFAC; or (5) a person or entity that is affiliated with any person or entity identified in the foregoing clauses (i), (ii), (iii) or (iv).

9.2    The representations and warranties contained in Article 9 are true and accurate as of the date hereof, shall be deemed to be repeated at and as of the Closing Date and shall be true and accurate as of such date. The representations, warranties and covenants of Purchaser set forth herein are a material inducement to Seller entering into this Agreement and Seller is relying on the truth and accuracy of same.

Article 10.  Closing Obligations.

10.1    At the Closing, Seller shall execute and/or deliver the following:

(i)    A bargain and sale deed with covenants against grantor's acts properly executed in the form for recording so as to convey title to the Property required by this Agreement;

(ii)    Certificates, licenses, permits, authorizations and approvals issued for or with respect to the Property by governmental and quasi-governmental authorities having jurisdiction, without representation or warranty with respect thereto;

(iii)    The Sale Order and all consents and resolutions required to consummate the transactions contemplated hereby, certified to be true and complete by the appropriate officers or representatives of Seller;

(iv)    An affidavit of Seller pursuant to Section 1445(b)(2) of the Internal Revenue Code of 1986, as amended, stating that Seller is not a foreign person within the meaning of such Section;

(v)    To the extent the same are in Seller's possession, all keys to the Property and all access codes, if any;

(vi)    Such affidavits, agreements and instruments as shall be reasonably required by the Title Company in order to omit from its title insurance policy all exceptions for judgments, bankruptcies or other returns against persons or entities whose names are the same as or similar to Seller's name;

(vii)    All other documents and instruments required by this Agreement to be executed and/or delivered by Seller at Closing; and

(viii)    Any other documents, instruments or agreements reasonably necessary to effectuate the transactions contemplated hereunder, in accordance with the express terms, covenants and conditions hereof.

10.2    At the Closing, Purchaser shall pay the Balance to Seller as provided in Article 2 hereof, subject to adjustment as provided in Article 11 hereof.

10.3    At the Closing, Purchaser shall execute and/or deliver the following:

(i)    An assumption by Purchaser of all of the interest of Seller in and to the certificates, permits, approvals and other documents to be delivered to Purchaser at the Closing which are then in effect with respect to the Property and are assignable by Seller, subject to the further terms and conditions of this Agreement;

(ii)    A written agreement authorizing Escrow Agent to release the Downpayment to Seller or Seller's designee, and releasing Escrow Agent from any liability arising out of the performance of its obligations pursuant to this Agreement;

(iii)    All consents and resolutions required to consummate the transactions contemplated hereby, certified to be true and complete by an authorized officer of Purchaser;

(iv)    Such affidavits, agreements and instruments as shall be reasonably required by the Title Company;

(v)    all other documents and instruments required by this Agreement to be delivered by Purchaser at Closing;

(vi)    Any other documents, instruments or agreements reasonably necessary to effectuate the transactions contemplated hereunder, in accordance with the express terms, covenants and conditions hereof.

Article 11.  Taxes and Other Expenses.

11.1    The Parties intend to Close under Bankruptcy Code §1129, which would render any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges payable in connection with the contemplated transactions inapplicable pursuant to Bankruptcy Code §1146.

11.2    Purchaser shall additionally pay for the following prior to or at the Closing:

(a)    All State, City, County and municipal recording charges with respect to the deed;

(b)    All costs and expenses in connection with Purchaser's financing (if any), and costs for the filing of all documents necessary to complete such financing and related documentary stamp tax and intangibles tax (as the same may be applicable); provided, however, that nothing herein contained shall be deemed to create a financing contingency or to condition Purchaser's obligations hereunder on Purchaser's ability to obtain financing, and this shall be deemed to be an "all cash" transaction;

(c)    The cost of any survey, survey re-date, and due diligence investigations;

(d)    The cost and expense of obtaining a title report and an Owner's Policy of Title Insurance and/or a Mortgagee's Policy of Title Insurance (if required), including any and all premiums, endorsements and coverage issued in connection with such policies.

11.3    Each party shall pay its own legal fees incidental to the negotiation, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

Article 12.  Apportionments.

12.1    The following shall be apportioned between the parties as of 11:59 P.M. on the day immediately preceding the Closing Date:

(a)    real estate transfer taxes;

(b)    water meter and frontage charges and sewer rents, if any, based upon a final water meter reading obtained by Seller, at Seller's sole expense, dated not more than thirty (30) days prior to the Closing Date.  Any adjustments for the period subsequent to such reading shall be made on a per diem basis based upon the most recent average daily usage, as shown by the special water meter reading.

(c)    vault taxes or charges, if any;

(d)    business improvement district charges and other governmental and quasi-governmental taxes, fees, assessments and charges, if any.

12.2    Purchaser acknowledges and agrees that Purchaser shall be responsible for the payment of any and all real estate taxes from and after the Closing Date. Seller acknowledges and agrees that all penalties and interests arising from the non-payment of pre- Closing Date real estate taxes are an obligation of Seller.

Article 13.  Risk of Loss; Condemnation.

13.01    Notwithstanding the provision of law to the contrary, if all or any portion the Property is damaged by fire or other casualty, (i) Purchaser shall purchase the Property in its "as is" condition at Closing, (ii) Seller shall assign the proceeds of Seller's casualty insurance, if any, less any expenditures actually and reasonably incurred by Seller in connection with rendering the Property safe to the public or otherwise necessary to prevent further damage and/or waste to occur to the Property, to Purchaser at Closing and shall not adjust or compromise a claim for such insurance proceeds without Purchaser's consent, in its sole discretion, (iii) the Purchase Price shall not be reduced or otherwise affected by such damage, (iv) Seller shall not be required to repair such damage and (v) Seller, at the Closing, shall execute, acknowledge and deliver to Purchaser such documents and instruments as Purchaser shall reasonably request in furtherance of the purpose of this Article 12 (a).

13.02    (a)  If between the date of this Agreement and the Closing Date, any portion of the Land is taken in condemnation or by eminent domain proceeding, Purchaser shall have the option to either (i) terminate this Agreement and, upon such election, this Agreement shall be deemed terminated and of no further force and effect and neither party hereto shall thereupon have any further obligation to the other with respect to this Agreement; or (ii) acquire the Property, subject to the terms and conditions of this Agreement and without any reduction or

15

abatement of the Purchase Price, but Purchaser shall receive 100% of any award resulting from such condemnation or eminent domain proceeding. Purchaser shall make such election within ten (10) business days after receiving notice from Seller of such condemnation.

<u>Article 14</u>.  <u>Covenants of Seller</u>.

14.1    Purchaser shall be permitted to have reasonable access to the Property from time to time, between the date of this Agreement and the Closing Date, during business hours and upon reasonable prior notice to Seller.

14.2    Seller shall not modify or amend any Service Contract or enter into any new service contract unless the same is terminated by Seller prior to the Closing Date.

14.3    Seller shall maintain in full force and effect until the Closing the insurance policies presently in effect or other commercially reasonable policies of insurance.

14.4    Seller shall not voluntarily create any new title encumbrances affecting the Property between the date hereof and the Closing which shall remain in full force and effect after the Closing Date.

<u>Article 15</u>.  <u>Brokerage</u>.

15.1    Seller will obtain Bankruptcy Court approval to engage an auctioneer to market and sell the Property at the Auction and providing for the manner in which said auctioneer will be compensated for its services and reimbursed for its expenses. Seller shall not be responsible for any compensation and/or expenses of any auctioneer or broker except to the extent, if any, expressly set forth in the Bankruptcy Court's order approving the engagement of the auctioneer.

<u>Article 16</u>.  <u>Remedies</u>.

16.1    If Purchaser defaults in its obligation to purchase the Property, or if Purchaser defaults in any of its other obligations under this Agreement, Seller's sole remedy shall be to terminate this Agreement and to receive and retain the Downpayment, and any interest thereon, as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be difficult or impossible to ascertain, and that the Downpayment, constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.  The Downpayment shall be non-refundable when made, subject to the further terms and conditions of this Agreement.

16.2    If Seller defaults in its obligation to convey the Property hereunder, or if Seller defaults in any of its other obligations under this Agreement, Purchaser's sole and exclusive remedy shall be either (i) to seek specific performance of this Agreement (without seeking damages) or (ii) to terminate this Agreement and to receive a refund of the Downpayment (without seeking damages).  Purchaser shall elect between the remedies in clauses (i) and (ii) above, and Purchaser may not seek to pursue both remedies simultaneously.

## Article 17. Escrow Agent.

17.1    Escrow Agent shall hold the Downpayment in escrow in its IOLA account maintained by Escrow Agent. Escrow Agent shall hold the Downpayment until the Closing or sooner termination of this Agreement, and shall pay over or apply the Downpayment in accordance with the terms of this Agreement. At the Closing, the Downpayment shall be paid by Escrow Agent to Seller, and Seller and Purchaser shall execute and deliver to Escrow Agent, an agreement in writing (i) authorizing Escrow Agent to deliver the Downpayment to Seller; and (ii) releasing Escrow Agent from any liability in connection with the performance of its obligations hereunder. If for any reason either party makes a written demand upon Escrow Agent for payment of the Downpayment, Escrow Agent shall give at least three (3) business days' prior written notice to the other party hereto of Escrow Agent's intention to pay over the Downpayment in accordance with such demand on a stated date. If Escrow Agent does not receive a written objection from the other party to the proposed payment before such stated date, Escrow Agent is hereby authorized and directed to pay the Downpayment to the party claiming to be entitled thereto. If Escrow Agent does receive written objection before such payment, or if for any other reason Escrow Agent, in its reasonable discretion, shall elect not to make such payment, Escrow Agent shall continue to hold the Downpayment until otherwise directed by written instructions from both Seller and Purchaser, or by a final judgment of a court of competent jurisdiction. Notwithstanding the foregoing or anything to the contrary contained herein, Escrow Agent shall have the right, at any time in its sole and absolute discretion, to deposit the Downpayment with any court of competent jurisdiction and thereby be relieved and discharged of any further obligation under this Agreement. Escrow Agent shall give written notice of such deposit to Seller and Purchaser.

17.2    The parties hereto acknowledge that Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that Escrow Agent shall not be deemed to be the agent of either of the parties hereto, and that Escrow Agent shall not be liable to either of the parties for any action taken by Escrow Agent, unless taken in bad faith, in willful disregard of this Agreement or with negligence. Seller and Purchaser shall jointly and severally indemnify, defend and hold harmless Escrow Agent from and against any and all losses, liabilities, costs, claims, damages or expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred in connection with the performance of Escrow Agent's duties hereunder, except with respect to actions taken by Escrow Agent in bad faith, in willful disregard of this Agreement or with negligence on the part of Escrow Agent. In the event of any dispute or claim regarding the terms and provisions of this Agreement, Purchaser agrees that Escrow Agent shall have the right to represent itself and/or Seller in any action or proceeding brought as a result of such dispute.

17.3    Escrow Agent acknowledges (i) its receipt of the Downpayment, subject to collection; and (ii) its agreement to the provisions of this Article 17 by signing in the place indicated on the signature page of this Agreement.

17.4    Nothing contained herein shall prevent or otherwise preclude Escrow Agent from representing Seller in connection with the sale of the Property or in any other matter.

17

Article 18.  Notices.

18.1    Any notice or other communication given by either party hereto to the other relating to this Agreement (a "notice") shall be in writing and shall be sent by hand delivery or by recognized overnight courier service (such as Federal Express), addressed to the parties and their attorneys as follows:

> If to Seller, to:
>
> Virginia True Corporation
> c/o Pick & Zabicki, LLP
> 369 Lexington Avenue, 12th Floor
> New York, New York 10017
> Attn:  Douglas J. Pick, Esq.
>
> With a copy to Seller's attorney:
>
> Pick & Zabicki, LLP
> 369 Lexington Avenue, 12th Floor
> New York, New York 10017
> Attn:  Douglas J. Pick, Esq.
>
> If to Purchaser, to:
>
> Fones Cliffs Development LLC
> c/o Cesar Fernandez, Esq.
> 2298 First Avenue, 2nd Floor
> New York, New York 10035
>
> with a copy to Purchaser's attorney:
>
> Cesar Fernandez, Esq.
> 2298 First Avenue, 2nd Floor
> New York, New York 10035

If to Escrow Agent, to:

Pick & Zabicki, LLP
369 Lexington Avenue, 12th Floor
New York, New York 10017
Attn: Douglas J. Pick, Esq.

      18.2    Notices or other communications (including agreements) signed by the attorneys for the respective parties shall be deemed binding upon the parties. Either party may by notice to the other change the person or address for receipt of notices. Notices sent by hand delivery or recognized overnight courier service shall be effective when received or rejected by the recipient or the recipient's office or firm.

### Article 19. Seller's Obligations as to Leases.

      19.1    Between the date of this Agreement and the Closing, Seller shall not permit occupancy of, or enter into any new lease for, space at the Property.

      19.2    Purchaser shall accept the Property subject to the Property being vacant on the Closing Date.

      19.3    The parties acknowledge and agree that the Property shall be delivered to Purchaser in vacant condition on the Closing Date.

### Article 20. Assignment.

      20.1    Purchaser shall be permitted to assign this Agreement to one or more corporations, partnerships, limited liability companies, trusts or other entities which are owned, controlled or managed by (or otherwise under common ownership, control or management) Purchaser or any members, shareholders, partners or affiliates thereof. In addition, provided Purchaser has complied with the foregoing sentence, Purchaser shall have the right to acquire the Lots comprising the Land in separate entities and, in such event, Purchaser and Seller agree that the Purchase Price shall be allocated among such Lots in amounts deemed reasonably acceptable to Purchaser and Seller.

### Article 21. Bankruptcy Matters.

    21.1    Competing Transaction.

      (a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each, a "Competing Bid"). Seller shall file an application (the "Sale Motion") for such approval to the Bankruptcy Court within five (5) business days after the execution of this Agreement by all Parties. Seller and Purchaser shall cooperate and comply in good faith with any procedural requirements of the Bankruptcy Court in order to receive the Court's approval of the sale and entry of the Sale Order and Final Order. In the event this Agreement is not approved by the Bankruptcy Court and/or if the parties

are otherwise prevented from closing by any act by the Bankruptcy Court or other governmental authority, this Agreement shall be null and void and Seller shall return the Downpayment.

(b)     Notwithstanding the execution of this Agreement, Seller is permitted to further market and initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person or entity (in addition to Purchaser) in connection with any sale or other disposition of the Property. In addition, Seller shall have the responsibility and obligation to respond to any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the assets of Seller to prospective purchasers.

(c)     If a Competing Bid is selected in conjunction with the Auction but such bidder does not consummate the purchase of the Property and Purchaser is the second highest bidder (the "Backup Bidder"), Purchaser shall be subject to the rights and responsibilities of the Backup Bidder as set forth in the Bidding Procedures.

21.2    Sale Hearing and Bid Procedures. Purchaser acknowledges and understands that approval of the terms and conditions of this Agreement will be subject to a hearing before the Bankruptcy Court on the Sale Motion (the "Sale Hearing"), and, consistent with Bankruptcy Code section 363, such approval will be sought by the Seller subject to any higher or better offers that may be tendered to the Seller at the Auction. Subject to the approval of the Bankruptcy Court, the terms and conditions of sale to govern the bidding at the Auction shall provide that in order to be considered by the Court and admissible on the date of the Sale Hearing, an initial competing offer (a "Competing Offer") must satisfy the following terms and conditions: (i) provide for a Purchase Price of at least $260,000.00 (constituting a topping fee of $210,000 plus an initial $50,000 overbid) more than the Purchase Price (i.e. $4,460,000) on such terms as are provided for in this Agreement; (ii) be on substantially the same terms and conditions of this Agreement; (iii) not be contingent upon the receipt of financing necessary to its consummation, and (iv) the Competing Offeror shall have demonstrated evidence of its ability to conclude the transaction upon the terms and conditions of this Agreement, without delay and in cash; (iv) not be conditioned upon the outcome of unperformed due diligence by the Competing Offeror; (v) the Competing Offeror shall provide, at or before the Auction, a certified check made payable to Pick & Zabicki, LLP as Attorneys for the Seller, in the sum of $223,000 as a down payment (5% of $4,460,000). In the case of any subsequent competing offer (a "Subsequent Competing Offer") received from any party which also satisfies the conditions set forth above, such Competing Offer shall provide for an incremental consideration at least $25,000.00 in excess of that provided by the initial Competing Offer and shall comply with all conditions of the Agreement. Each subsequent incremental bid must be not less than $25,000.00. The Bidding Procedures will provide a topping deposit to bring the down payment amount up to ten percent (10%) of the final Successful Bid Amount and shall include the requirement that, in the event that Purchaser is not the Successful Bidder for the Property, the Purchaser will be paid a topping (or "break up") fee of 5% of its $4,200,000.00 stalking horse offer (i.e., $210,000.00 (which fee is incorporated into the minimum initial Competing Offer discussed above); provided however, that if this Agreement is terminated pursuant to any fault of Purchaser, Purchaser shall forfeit its right to any topping fee and, at Seller's discretion, the forfeiture of its Downpayment.

Article 22.  Miscellaneous.

22.1    Seller and Purchaser each reserve the right to include this transaction as part of one (1) or more Internal Revenue Code Section 1031 tax deferred exchange transactions, at no out-of-pocket cost, expense or liability to the other party hereto (other than de-minimus legal fees to review the documentation required to effectuate such transactions), including, without limitation, one (1) or more reverse exchange transactions.  Seller and Purchaser agree to cooperate with the other party hereto, and to execute any and all documents as are reasonably necessary in connection therewith, provided that the closing of the transaction for the conveyance of the Property shall not be contingent upon, and shall not be subject to, the completion of such exchange, nor shall such affect the Closing Date hereunder.  Nothing set forth herein shall require Purchaser to take title to any property other than the Property described herein.  Seller further reserves the right, in Seller's sole discretion prior to the Closing, to make transfers to intermediate entities and/or trusts for the benefit of the principals of Seller or their immediate family members, provided same shall not affect or impair Seller's ability to close this transaction.

22.2    All understandings and agreements heretofore had between Seller and Purchaser are merged in this Agreement, which alone completely expresses their agreement, and this Agreement is entered into after full investigation, neither party relying upon any statement or representation made by the other and not embodied in this Agreement.

22.3    Purchaser's acceptance of the deed to the Property shall be deemed an acknowledgment by Purchaser that Seller has fully complied with all of its obligations hereunder; that Seller is discharged therefrom (or Purchaser has waived compliance therewith); and that Seller shall have no further obligation or liability with respect to any of the agreements, representations and/or warranties made by Seller in this Agreement, which shall be merged with the deed to the Property.

22.4    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.

22.5    This Agreement does not constitute an offer to sell and shall not bind Seller unless and until Seller elects to be bound hereby by duly executing and delivering to Purchaser an executed original counterpart hereof.

22.6    This Agreement may only be amended, modified, altered, supplemented or, except as otherwise expressly provided herein, terminated, by a written instrument signed by Seller and Purchaser.

22.7    If any provision of this Agreement or the application thereof to any party or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to parties or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision shall be valid and be enforced to the fullest extent permitted by law.

21

22.8    This Agreement, and the rights, obligations and relations of the parties hereunder, shall be governed by and construed and enforced in accordance with the laws of the State of New York without giving effect to the conflict-of-law rules and principles of that state.

22.9    Purchaser shall not be permitted to record this Agreement and all Recordation Offices are specifically instructed not to record the same.

22.10    At the written request of Purchaser, Seller shall request, and shall use reasonable efforts to cause the existing mortgages encumbering the Property to be assigned to Purchaser's mortgage lender at Closing, at no cost or expense to Seller.  Purchaser shall receive, at Closing, one hundred (100%) percent of any mortgage recording tax savings realized as a result of the aforesaid mortgage assignment.

22.11    A facsimile, "pdf" and/or electronic copy of a signed original counterpart of this Agreement shall be deemed sufficient to bind the parties, and shall be deemed an original for all purposes.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which, when combined, shall constitute one (1) fully executed original document.

22.12    This Agreement shall be governed by and construed in accordance with the domestic laws of the Commonwealth of Virginia without giving effect to any choice or conflict of law provision or rule (whether of the Commonwealth of Virginia or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Commonwealth of Virginia, as well as, the provisions of the Bankruptcy Code.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

22.13    The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof.

22.14    In interpreting any provision of this Agreement, no weight shall be given to, nor shall nay construction or interpretation be influenced by, the fact that counsel for one of the parties drafted this Agreement, each party recognizing that it and its counsel have had an opportunity to review this Agreement and have contributed to the final form of same.  Unless otherwise specified (a) whenever the singular number is used in this Agreement, the same shall include the plural, and the plural shall include the singular, (b) the words "consent" or "approve" or words of similar import, shall mean the prior written consent or approval of Seller or Purchaser, (c) the words "include" and "including" or words of similar import shall be deemed to be followed by the words "without limitation" and (d) the Exhibits to this Agreement are incorporated herein by reference.

**IN WITNESS WHEREOF**, Seller and Purchaser have each duly executed this Agreement as of the date first above written.

**SELLER**:

VIRGINIA TRUE CORPORATION

By: _____

Benito R. Fernandez
President

**PURCHASER**:

FONES CLIFFS DEVELOPMENT LLC

Pan American Claim Investors, LLC, Member
By its Sole Member, Warlock Acquisitions, S.L.

By: _____

Vicente Penades
Managing Member

Receipt of the Downpayment is
acknowledged and the undersigned
agrees to act in accordance with the
provisions of Article 17 hereof.

PICK & ZABICKI, LLP

By: _____

Name: Douglas J. Pick, Esq.
Partner

23

EXHIBIT A

ALL property and rights thereunder that Grantor owns or has in Richmond County, Virginia, and any and all subaqueous title and rights Grantor may have in land under the Rappahannock River and its tributaries, including but not limited to all those certain three parcels or tracts of land lying and being in Stonewall Magisterial District, Richmond County, Virginia, containing in the aggregate 964.11 acres, more or less, and designated as 753.73 acres, TM #4-1; 181.90 acres and 2.41 acres (C) TM #4-2; and, 26.07 acres, TM #5-30 on that certain plat of survey made by J. L. Howeth, Land Surveyor, dated January 22, 2015, entitled "Compiled Plat Showing Boundary Survey on the Property of Diatomite Corporation of America...", attached hereto and made a part hereof, for a more complete and accurate description of the properties herein conveyed.

BEING a portion of the same and identical real property conveyed unto the Grantor herein from 130 Corporation, by deed dated June 20, 1977, recorded in the Clerk's Office of the Circuit Court of Richmond County, Virginia in Deed Book 100 at page 480 and also being the same property wherein boundaries were adjusted by that certain Boundary Line Agreement between the Grantor herein and Terrell W. Bowers, dated December 9, 2010, recorded in the Clerk's Office of the Circuit Court of Richmond County, Virginia in Deed Book 285 at page 947.